CAPE FOX CORPORATION

v.

The UNITED STATES.

No. 664–80L.

United States Claims Court.

Dec. 27, 1983.

---

Peter R. Ellis, Ketchikan, Alaska, for plaintiff; Bruce Davies, Ketchikan, Alaska, of counsel.

Cynthia L. Pickering, Anchorage, Alaska, with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D.C., for defendant; Robert Maynard, Dept. of Agriculture, Washington, D.C., of counsel.

Thomas E. Meacham, Anchorage, Alaska, filed a brief for Eklutna, Inc., as amicus curiae; Edward G. Burton and Burr, Pease & Kurtz, Anchorage, Alaska, of counsel.

## OPINION

· HARKINS, Judge:

Plaintiff, Cape Fox Corporation (Cape Fox), is a village corporation incorporated under the laws of the State of Alaska pursuant to section 8(a) of the Alaska Native Claims Settlement Act (ANCSA).[1] Plaintiff's petition was filed in the United States Court of Claims on December 10, 1980, pursuant to an order and judgment on August 4, 1978, by the United States District Court for the District of Alaska, and an amended petition was filed on February 19, 1981. The case was transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[2]

1. Pub.L. No. 92–203, 85 Stat. 688 (1971) (codified 43 U.S.C. §§ 1601–28 (1983)). Cape Fox is the village corporation for Saxman, in southeast Alaska, and is eligible pursuant to ANCSA to select certain federal lands in Alaska for conveyance to itself. Sealaska Corporation is the regional corporation established pursuant to ANCSA for the region in which Saxman is located.

2. 28 U.S.C. § 171 note (1983). This action originally was filed in district court as *Cape Fox Corp. v. United States,* Civ. No. K 76–1, on May 21, 1976, and sought monetary, equitable and declaratory relief against the United States, officials of the Department of Agriculture (Forest Service) and three private timber companies in connection with the extension of a timber sale contract between the Forest Service and one of the timber companies. On July 2, 1976, Cape Fox filed an amended complaint which named additional defendants and sought declaratory and equitable relief in connection with the conveyance of selected land to the corporation.

The district court denied the motion for a temporary restraining order and a preliminary injunction. After extensive discovery, the district court decided the case on cross-motions for summary judgment: it transferred the money claim against the United States to the Court of Claims; it granted declaratory judgments declaring that ANCSA does not give rise to any trust responsibilities on the part of the United States or federal officials; and that the timber sale contract properly was extended. The court refused to compel conveyance of the selected lands. The court reserved judgment on a deterioration issue, which was never decided and was abandoned by plaintiff, and dismissed the trespass. claim. 456 F.Supp. 784 (D.Ak. 1978).

On appeal, the Ninth Circuit affirmed the transfer of the money claims against the United States to the Court of Claims, and ordered the district court to vacate the declaratory judgments on the issues of trust duty and extension of the timber contract on the ground that the declaratory judgments undermined the exclu-

The amended petition (now complaint) asserts the United States is liable in damages in excess of $8,648,156, plus interest, as a result of the extension of a Forest Service timber sale contract on December 23, 1974, on lands that plaintiff had selected under ANCSA on December 12, 1974. The case is before the court on plaintiff's motion for partial summary judgment on liability issues and defendant's cross-motion for summary judgment.

Plaintiff asserts a taking claim under the fifth amendment, or, alternatively, liability for alleged violations of standards established by statute and regulation applicable to extension of timber sale contracts or, for failure to perform fiduciary duties to manage plaintiff's timber resources. Defendant denies that the extension of the timber sale contract amounts to a fifth amendment taking, and asserts that the court is without jurisdiction to entertain plaintiff's claims relative to breach of fiduciary duties or violation of statutory standards. Eklutna, Inc., a native village corporation, by counsel, has submitted a statement of interest as amicus curiae on behalf of plaintiff on the scope of the authority of the United States to manage selected lands prior to conveyance of the land to a selecting corporation.

On plaintiff's motion for partial summary judgment and defendant's cross-motion, without oral argument, for the reasons that follow, defendant is entitled to prevail.

## FACTS

The essential facts have been stipulated or are not in dispute.

On October 17, 1969, the United States entered into the Devil's Club No. 2 Timber Sale Contract, (contract), with the contract retroactive to June 26, 1969. The contract provided for Annette Timber Corporation, later known as Alaska Timber Corporation (ATC), to harvest an estimated 43.6 million board feet of timber from the Tongass National Forest by December 31, 1974, under standard Forest Service procedures. During calendar years 1969 through 1973, no action was taken toward harvesting timber covered by the contract and there was no logging or road development during those years.

The Devil's Club sale area covers 1,530 acres on Revillagigedo Island, immediately adjacent to Coon Cove on the east side of George Inlet, about 10 air miles northeast of Ketchikan, Alaska, and entirely within a secondary township which is contiguous to the primary township at Saxman. This township is within the area from which Cape Fox was permitted to make land selections under ANCSA.

The contract was awarded to ATC prior to construction of ATC's sawmill in Klawock, Alaska. Beginning in 1971, ATC had financial difficulty in completing construction of the mill and the mill did not begin operations until the spring of 1973. Ketchikan Pulp Company (KPC) requested a third party agreement on the contract on March 8, 1973. The proposed third party agreement was never approved by the Forest Service. By contract dated April 27, 1973, KPC assumed performance of the contract as ATC's purchaser's representative. ATC remained fully responsible to the Forest Service for performance.

On January 18, 1973, the regional corporation, Sealaska, held a meeting in Saxman at which it was agreed to form a Saxman land selection committee, composed of members elected from the village of Saxman. On April 19, 1973, Forest Service officials and Sealaska representatives discussed the Devil's Club timber sale contract. Cape Fox filed for incorporation on November 13, 1973. Cape Fox was required to select 23,040 acres of land for conveyance under ANCSA by December 18, 1974. The requirements of ANCSA and its implementing regulations forced Cape Fox to make almost all of its land selections from town-

---

sive jurisdiction of the Court of Claims to determine liability for damages. The Court approved the dismissal of the trespass claim, although it had not been appealed; and declared moot the issue of compelling immediate conveyance, since Cape Fox had received conveyance in the interim. *Cape Fox Corp. v. United States,* 646 F.2d 399 (9th Cir.1981).

ships other than the two primary townships in which Saxman is located.

During March 1974, KPC began to build logging roads in the contract area. On April 24, 1974, the Forest Service informed ATC that the contract expired on December 31, 1974, and that it might not qualify for an extension. Subsequent to the notification, KPC, on behalf of ATC, began vigorous efforts to cut timber in order to qualify for an extension and made substantial progress toward harvesting and road building. Logging did not begin until April 1974 and the first logs were removed on August 15, 1974.

On August 13, 1974, in a meeting between representatives of KPC and the Forest Service, the Forest Service informed KPC that the Devil's Club sale area was within the Cape Fox selection area and that an extension of the contract depended in part on acceptance of a modification that would meet Forest Service environmental standards. KPC was told to limit its operations so that meaningful environmental review would be possible.

On August 23, 1974, the Forest Service wrote ATC and advised it that the contract area was within the Cape Fox selection area, that environmental considerations would change the size of the clear cut units and reduce the total volume upon final extension, that it should confine its harvest to particular areas, and that a failure to do so would result in a denial of the extension. On November 25, 1974, ATC requested a 2-year extension, indicating that as of October 31, 1974, 25 million board feet had been cut.

After July 1974 the Forest Service attempted to contact orally the president of Cape Fox several times, but got no reply. A meeting in December 1974 was held between the president of Cape Fox and the Ketchikan Area Timber Management Officer, to discuss the extension and modification of the timber sale contract. Cape Fox's president was informed that the Devil's Club sale area was within the Cape Fox selection area.

On December 2, 1974, a letter was sent by the Forest Supervisor to Cape Fox, that informed plaintiff that the contract probably would be extended.

On December 12, 1974, Cape Fox submitted its selection application pursuant to ANCSA, which included the 1,530 acre area authorized for cutting by the original Devil's Club contract.

On December 23, 1974, ATC was sent a form to extend conditionally the contract for a short period to allow the environmental report and modification to be completed. No timber was to be cut until the contract was finally extended.

On December 26, 1974, Sealaska Corporation, for itself and Cape Fox, sent a letter to the Regional Forester advising that the contract purchaser had not pursued the contract diligently, that Cape Fox had selected the area, that ANCSA requires the maximum participation of natives in decisions affecting their rights and property, and that Cape Fox opposed the contract extension. The letter stated that Cape Fox opposed the extension until such time as a meeting could be held between Cape Fox and Sealaska personnel and the Forest Service to determine the merits and possible additional conditions of a contract extension.

On January 8, 1975, a letter from the Regional Forester to Sealaska Corporation stated that the purchaser had done enough to qualify for an extension and that a conditional decision to grant the extension had been made which would become final upon approval by the purchaser of the reappraisal and environmental modifications.

After meeting with the Forest Service, Sealaska withdrew its objection to the extension. Cape Fox was informed on April 8, 1975, in a letter from Sealaska, that it had withdrawn its objection. Cape Fox did not communicate in writing its disagreement with Sealaska's position to the Forest Service until May 1976.

The contract conditionally was extended to March 31, 1975, and then again was extended conditionally to May 31, 1975. On

May 2, 1975, the contract was extended to December 31, 1976. The latter extension was conditioned upon the purchaser limiting logging operations to the removal of already felled timber from specified areas until final approval of the environmental modification of the contract by the Regional Forester.

An Environmental Analysis Report concerning the Devil's Club No. 2 timber sale contract, prepared by the Forest Service, was made final on August 15, 1975, and approved on November 12, 1975. While the environmental analysis and contract modification were being proposed, the Forest Service attempted to contact plaintiff but was unsuccessful. On June 24, 1975, a copy of the contract was sent to plaintiff, and on December 3, 1975, a meeting was held between the Forest Service and plaintiff. Further information was sent on December 12, 1975. On January 13, 1976, plaintiff's counsel wrote to the Forest Service concerning the timber contract escrow account. None of these communications objected to the environmental modification or to the extension.

The environmental modification of the contract received final approval from the Regional Forester on November 12, 1975. A final agreement to extend and modify the contract until December 31, 1976, was executed on December 31, 1975. The final modification removed eight cutting areas, and reduced the harvest area from 1,530 acres to 700 acres of the timber within the Devil's Club boundary. The rest of the timber within the Devil's Club sale area remained available to Cape Fox after selection. The modification was thought to reduce the contract sale to 28.5 million board feet; subsequent calculations revealed that the volume of the sale was approximately 27.7 million board feet.

In a letter dated February 26, 1976, Cape Fox asked the Forest Service to substitute other timber areas for the Devil's Club area under 43 U.S.C. § 1614. On March 16, 1976, ATC refused to substitute timber areas and the Forest Service advised Cape Fox that substitution under 43 U.S.C. § 1614 did not permit unilateral modification of contract boundaries.

On March 31, 1976, the Bureau of Land Management issued a decision to grant an interim conveyance to the Devil's Club area subject to the ANCSA restriction for national forests and reservations by the United States. The conveyance inadvertently omitted the reservation required by 43 U.S.C. § 1613(c), Cape Fox prepared a written waiver of its right to object to the omission, but Cape Fox's waiver contained a typographical error. The Bureau of Land Management refused to accept the written waiver. Further action on the decision to enter an interim conveyance halted upon the refusal of the Bureau of Land Management to accept plaintiff's oral waiver of its objection to the omission, and plaintiff's refusal to sign an easement agreement.

At a meeting on May 7, 1976, Cape Fox indicated it wanted to stop the sale and filed suit in Alaska district court on May 21, 1976. As of May 15, 1976, there were standing about 5 million board feet of timber remaining to be cut under the contract. A total of about 4 million additional board feet had been cut and bucked and about 3 million board feet was then in rafts. On May 6, 1977, the Forest Service notified ATC that all contract requirements had been met and the contract was closed.

Subsequent to closure of the contract, plaintiff requested administratively, and in conjunction with the proceedings before the United States District Court of Alaska, that it be allowed to exclude the fallen timber area in the Devil's Club sale from its land selection, and to substitute, by way of exchange, other national forest lands of its own choice without the withdrawal area of a value equal to the land excluded and without restriction as to their being contiguous or compact in nature. This request was denied.

On August 4, 1978, patent covering the sale area was issued to Cape Fox. Cape Fox signed an easement agreement that permitted interim conveyance while litigation over easements continued.

Cape Fox has received $231,993.26, the total amount of stumpage proceeds due from the escrow account for proceeds of withdrawn lands.

## DISPOSITION

Plaintiff's amended petition invoked the Tucker Act jurisdiction of the Court of Claims, which now is exercised by this court. This jurisdiction now is in 28 U.S.C. § 1491(a)(1), which, in pertinent part provides:

(a)(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Jurisdiction of plaintiff's claim must be found in the authority conferred by "the Constitution, or any Act of Congress, or any regulation." No contract between Cape Fox and the United States has been pleaded, and none is involved. The jurisdiction conferred by the phrase "for liquidated or unliquidated damages in cases not sounding in tort" is not relied upon by plaintiff, and that clause "has never been fully and authoritatively construed."[3] The Court of Claims also has ruled that this phrase does not include jurisdiction over claims for breach of fiduciary duty unless there also is a statute or regulation that mandates payment of money.[4] The constitutional provisions, statutes and regulations involved in

plaintiff's claim are: the 5th amendment, the provisions of ANCSA, the provisions of the Alaska National Interest Lands Conservation Act (ANILCA)[5] applicable to disposition of proceeds of withdrawn lands, implementing regulations, and statutes and regulations applicable to extension of Forest Service timber sale contracts.

Defendant's cross-motion challenges plaintiff's statutory and fiduciary claims for failure to overcome the jurisdictional bar of sovereign immunity. The confusion that has arisen as to whether the Tucker Act constitutes a waiver of sovereign immunity, and the relationship of the waiver to the requirement for a money claim, has been clarified by the Supreme Court in *Mitchell II*.[6]

 Historically, the Tucker Act has been interpreted as a waiver of sovereign immunity for the classes of claims described. If a claim falls within the terms of the Tucker Act, the United States presumptively has consented to suit. The Tucker Act, however, does not create any substantive right enforceable against the United States for money damages. A substantive right also must be found in some other source of law.[7] Every claim that is based upon the Constitution, a statute, or regulation, except for a limited authority to issue declaratory judgments or grant injunctive relief, must be for money damages against the United States.[8]

In summary, the Supreme Court described the content of 28 U.S.C. § 1491(a)(1) as follows:

Court decision at 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Mitchell II* in the Court of Claims is at 664 F.2d 265 (Ct.Cl.1981).

---

**3.** *Mitchell v. United States,* 664 F.2d 265, 270 n. 7 (Ct.Cl.1981).

**4.** *Inupiat Community of the Arctic Slope v. United States,* 680 F.2d 122, 132 (Ct.Cl.1982).

**5.** Pub.L. No. 96–487, § 1411, 94 Stat. 2497 (1980) (codified 43 U.S.C. § 1613 note).

**6.** *United States v. Mitchell,* —— U.S. ——, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). This litigation includes two Court of Claims opinions and two Supreme Court opinions: *Mitchell I* includes the Court of Claims decision at 591 F.2d 1300, 219 Ct.Cl. 95 (1979), and the Supreme

**7.** *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

**8.** *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). *See* 28 U.S.C. § 1491(a)(3) (contract claims brought before contract is awarded) and 28 U.S.C. § 1507 (actions under section 7428 of the Internal Revenue Code of 1954).

Thus, for claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. In undertaking this inquiry, a court need not find a separate waiver of sovereign immunity in the substantive provision, just as a court need not find consent to suit in "any express or implied contract with the United States." Ibid. The Tucker Act itself provides the necessary consent.[9]

█ Where the statutes or regulations require compensation, consent to suit is supplied by the Tucker Act, and the separate statutes and regulations on which the claim is based need not provide a second waiver of sovereign immunity. It is not appropriate to construe such statutes or regulations in the manner appropriate to waivers of sovereign immunity.[10]

█ When jurisdiction is invoked by a recognized tribe or group of Indians, the relevant statutes and regulations are to be considered in the light of the undisputed existence of a general trust relationship between the United States and the Indian People. The Supreme Court noted and emphasized the dominance of "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people."[11] The existence of this general trust relationship, however, does not resolve the scope of the Government's obligations.

█ The use or absence of the word "trust" in the relevant statute is not controlling. Where the Federal Government takes on control or supervision over tribal monies or properties, a fiduciary relationship exists with respect to such money or property that imposes a duty to account as a trustee, in the absence of a specific Congressional disclaimer, even though nothing is said expressly in the authorizing or underlying fundamental document about a trust fund, a trust, or a fiduciary connection.[12] Similarly, the timber management statutes, federal statutes governing road building and rights-of-way, and statutes governing Indian funds and government fees, and their supplemental regulations, because they contemplated monetary benefits to the Indians, implicitly imposed a fiduciary relationship upon the United States in its management of forested allotted lands that invokes the normal accountability of a trustee.[13] Conversely, even though the statute stated allotted lands were to be held "in trust," the General Allotment Act was held to create only a limited or bare trust relationship that did not impose any duty on the Government to manage timber resources.[14]

9. *United States v. Mitchell,* — U.S. at —, 103 S.Ct. at 2968.

10. Id., citing *United States v. Emery, Bird, Thayer Realty Co.,* 237 U.S. 28, 32, 35 S.Ct. 499, 500, 59 L.Ed. 825 (1915); *United States v. Aetna Surety Co.,* 338 U.S. 366, 383, 70 S.Ct. 207, 216, 94 L.Ed. 171 (1949).

11. *United States v. Mitchell,* — U.S. at —, 103 S.Ct. at 2972. Cape Fox is a native village corporation under ANCSA. A native village means "any tribe, band, clan, group, village, community or association in Alaska." (43 U.S.C. § 1602(c)) ANCSA is the product of the settlement of Indian aboriginal claims, and should be construed in the sympathetic light of the general trust relationship accorded other Indian tribes. There is some confusion in terminology. The Court of Claims in *Mitchell II* used the term "general fiduciary obligation" to identify a complete trust that is fully accountable and is different from the "special trust imposed by the Allotment Act." 664 F.2d at 270. The Supreme Court, on the other hand, uses the term "a general trust relationship" in the restricted sense equivalent to the "limited trust relationship" or the "bare trust" created by the Allotment Act. *Mitchell II,* — U.S. at — — —, 103 S.Ct. at 2970–71.

12. *Navajo Tribe of Indians v. United States,* 624 F.2d 981, 987, 224 Ct.Cl. 171 (1980).

13. *Mitchell II,* — U.S. at —, 103 S.Ct. at 2972.

14. *Mitchell I,* 445 U.S. at 543, 100 S.Ct. at 1354; *Hydaburg Coop. Assn. v. United States,* 667 F.2d 64 (Ct.Cl.1981), cert. denied, 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982).

Where Congress intended and recognized only a limited trust relationship, fiduciary obligations applicable to private trustees are not imposed upon the Government; where the money claim or the alleged fiduciary duty stems from a statute or regulation, such statute or regulation must be capable of being fairly interpreted as mandating compensation by the Federal Government for the damages sustained. The substantive right to money need not be explicitly stated but the obligation for money compensation must be clear and strong.[15]

Plaintiff's due process and taking claims are based upon property interests provided by the ANCSA. Any liability for extension of the timber sale contract, or for violation of management standards applicable to withdrawn lands, is determined by the relevant terms of the ANCSA.

The ANCSA is comprehensive. It sets out with particularity the rights of the United States, the natives, the State, and third parties, with respect to the lands and revenues to be distributed, and established a time frame in which these rights and duties are to attach.

The ANCSA had one overriding purpose: to clear title, through Congressional action, to all lands within Alaska by settlement of all aboriginal land titles and claims. The settlement was a political decision, made as a matter of grace. Congress was not required to give the natives any compensation for the taking of aboriginal title.[16]

The ANCSA was enacted in 1971 to provide "a fair and just settlement." It extinguished all claims to aboriginal title based on use and occupancy in Alaska. In exchange, Congress gave the Alaska Natives $962,500,000 and 40 million acres of land in fee simple. The settlement was to be in lieu of litigation, with maximum participation by natives in decisions affecting their rights and property, but "without creating a reservation system or a lengthy wardship or trusteeship." [17]

To implement land settlement in southeastern Alaska, ANCSA as of December 18, 1971, withdrew from disposition under the public land laws all lands in townships where native villages are located (primary townships) and in contiguous or cornering townships (secondary townships), subject to valid existing rights. From withdrawn land, each village corporation was to select during the next 3-year period 23,040 acres, which were to include available land in the township in which the village is located.[18] The Secretary of the Interior is directed "immediately after selection," to issue a patent of a surface estate of 23,040 acres to a village corporation found qualified. Prior to granting any patent to a village or regional corporation, however, the Secretary of the Interior is required to consult with the State and with the Joint Federal-State Land Use Planning Commission for Alaska and shall reserve public easements that he determines are necessary.

Prior to conveyance, lands withdrawn from selection under the Act remain subject to the administration of the Secretaries of

---

15. *Inupiat Community of the Arctic Slope v. United States*, 680 F.2d at 130.

16. *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1950).

17. 43 U.S.C. § 1601(b) provides:
 "(b) the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of

property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the state of Alaska;".

18. 43 U.S.C. §§ 1615(a) and (b). In other parts of Alaska, native villages are entitled to the surface estate of 69,120 to 161,280 acres depending upon their population. In southeast Alaska, village corporations, regardless of population, receive 23,040 acres, and in lieu of additional land, they received the funds appropriated and distributed pursuant to the Court of Claims judgment in *Tlingit & Haida Indians of Alaska v. United States*, 389 F.2d 778, 182 Ct.Cl. 130 (1968). 43 U.S.C. § 1615(c).

the Departments of Interior or Agriculture. The Secretaries' authority to make contracts and to grant leases, permits, rights-of-way, or easements "shall not be impaired by the withdrawal."[19] All conveyances made pursuant to ANCSA are "made subject to valid existing rights," including contracts and leases.[20]

In 1976, the ANCSA was amended to provide for the disposition of proceeds of withdrawn lands pending conveyance of selected lands to regional or village corporations. On and after January 1, 1976, proceeds were to be deposited in an escrow account, and on conveyance of selected lands, the proceeds, together with interest, were to be paid to the appropriate corporation. In 1980, ANILCA expanded the escrow provision to make it retroactive to include proceeds derived from date of withdrawal of the lands.

There is no provision in ANCSA that expressly creates a trust or fiduciary relationship between a village corporation and the United States that is to be operative before or after land selection. Nor is there any provision that expressly authorizes the payment of money damages for mismanagement by the United States of timber or other lands after selection, or for violation by government officials of the provisions applicable to extension of timber sale contracts on selected lands. Any such fiduciary obligations, management duties or liabilities, if they exist, accordingly, must be found from construction of the language of ANCSA, and its legislative history and from the necessary implications of its objectives and policies.

In its amended complaint, plaintiff asserts that a fiduciary relationship was created by the terms of ANCSA between plaintiff and the Department of Agriculture regarding the management of a village corporation's selected lands during the period after selection and prior to final conveyance. The motion for partial summary judgment identifies the ANCSA provisions that give content to defendant's fiduciary and management obligations as: the provision of ANCSA that provides for withdrawal of the sale area as of December 18, 1971;[21] the provision which authorizes the Secretary of Agriculture to manage national forest lands that have been selected until conveyance;[22] and the declaration of congressional policy that the settlement should be accomplished with maximum participation by natives in decisions affecting their rights and property.[23]

Any interpretation that these provisions carry an implication that Congress created a fiduciary relationship with village corporations in the management of selected lands would be strained and contrary to the legislative history. There is no indication that Congress in its enactment of ANCSA intended a fiduciary relationship.[24]

ANCSA specifies that all lands withdrawn "shall be subject to valid existing rights," and that the Secretary's authority to manage the withdrawn lands prior to conveyance under applicable laws and regulations shall not be impaired by the withdrawal.

 In ANCSA, it is clear that Congress intended to avoid a fiduciary relationship between Alaska natives and the United States. The policy declaration notes the Alaska natives were not to be subjected to the creation of a reservation system or lengthy wardship or trusteeship. Statutory language which would have created obliga-

19. 43 U.S.C. § 1621(i).

20. 43 U.S.C. § 1613(g).

21. 43 U.S.C. § 1615(a).

22. 43 U.S.C. § 1621(i) provides:
"Prior to a conveyance pursuant to section 1613 of this title, lands withdrawn by or pursuant to sections 1610, 1613, and 1615 of this title shall be subject to administration by the Secretary, or by the Secretary of Agriculture in the case of National Forest lands, under applicable laws and regulations, and their authority to make contracts and to grant leases, permits, rights-of-way, or easements shall not be impaired by the withdrawal."

23. 43 U.S.C. § 1601(b). *See* note *17.*

24. *Hydaburg Coop. Assn. v. United States,* 667 F.2d at 59.

234

tions to village corporations in the management of selected lands, of the type that plaintiff's asserts was considered and rejected.[25]

During the progress of the settlement legislation through Congress, management of withdrawn lands for the benefit of the natives repeatedly was suggested, but that approach ultimately was rejected. It is clear Congress intended that the settlement of Alaska native claims be accomplished without the establishment of a trustee-beneficiary relationship between Alaska natives and defendant. A system Congress intentionally avoided should not be created by judicial fiat.[26] Since ANCSA does not establish a fiduciary relationship between Cape Fox and defendant, ANCSA does not mandate the monetary relief ordinarily available to a wronged beneficiary for a breach of trust.

In addition to its contention that defendant had a fiduciary duty to manage selected lands for the benefit of village corporations, plaintiff contends that the decision to extend the timber sale violated applicable Forest Service standards. The decision to extend, therefore, allegedly was arbitrary and capricious and resulted in violation of 43 U.S.C. § 1621(i).

■ No provision of ANCSA indicates, much less "mandates," that money damages are provided for a departure from management standards or for a violation of the Secretary's continued authority to make or extend contracts on withdrawn and selected lands. ANCSA does not create or imply a right to money damages for misfeasance by defendant in the administration of selected lands.

Management of selected lands for the benefit of the native corporations would be difficult and impractical. The native corporations have been permitted to over-select their entitlements.[27] Alaska native corporations selected approximately 122,600,000 acres, amounting to about three times their entitlement, and plaintiff on December 12, 1974, had selected approximately 32,000 acres in excess of its entitlement. Because of over-selection, the majority of lands selected will never be conveyed to the corporations. In such circumstances, liability for money damages for departure from management standards would be inappropriate. ANCSA, instead, in the escrow provision provides a specific method to compensate for removal of assets from selected lands.

The 1980 escrow amendment limits a native corporation to proceeds from contracts let on withdrawn lands "to proceeds actually received by the United States plus interest," and the escrow funds are not paid over until conveyance of the lands from which the funds were derived. Plaintiff has been paid the total amount due from the escrow account, and does not suggest that defendant has breached its duties with respect to proceeds in that account.

■ Plaintiff contends it is entitled to more than the escrow amounts; that it is entitled to what it could have received if the timber sale had not been extended. Congress believed it was necessary to amend ANCSA so that the native corporations could have a right to receive revenues

25. The Senate report, S.Rep. No. 920405, 92d Cong., 1st Sess. 61 (1971) (accompanying S. 35), stated:

"A major purpose of this committee and the Congress is to avoid perpetuating in Alaska the reservation and trustee system which has characterized the relationship of the Federal Government to the Indian peoples in the contiguous 48 states."

The House rejected H.R. 7039, which in section 12(b)(1) provided patent would be issued promptly on completion of a survey of selected lands and that the Secretary would hold the lands and interests in lands to which a village may be entitled "in trust" until the village qualifies to own real property. The Conference report, H.R.Conf.Rep. No. 92–746 (92d Cong., 1st Sess. 37, reprinted in [1971] U.S.Code Cong. & Admin.News 2192, 2247, 2250), indicates that Congress "adopted a policy of self-determination on the part of the Alaska Native people," and states that the "lands granted by this Act are not 'in trust' and the Native villages are not Indian 'reservations'."

26. Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974).

27. 43 C.F.R. § 2651.4(f).

earned from withdrawn lands. Prior to the escrow amendment, selecting corporations had no right to such present economic benefits, much less a right to speculative prospective benefits. Subsequent legislation declaring the intent of an earlier statute is entitled to great weight.[28]

■ Extension of the timber sale contract was in accordance with the Forest Service policies and regulations. Plaintiff concedes that ANCSA authorizes the extension of a valid pre-existing timber sale contract on lands that have been selected, if the extension is done in accordance with applicable laws and regulations. Plaintiff contends, however, that extension of the Devil's Club No. 2 sale was invalid and unlawful because, contrary to Forest Service standards, (1) ATC had failed to cut the 50 percent of the advertised timber volume prior to its application for extension, and (2) the extension granted exceeded the maximum authorized by the Forest Service Manual (FSM).

Forest Service policy applicable to an extension of a timber sale contract in existence at the time the contract was executed, is a part of the contract. The Forest Service is liable for breach of this contract commitment if it erroneously refuses to extend a timber sale eligible for extension.[29]

The FSM provision applicable to the Devil's Club No. 2 sale was flexible and permitted an extension to be made in an appropriate case notwithstanding a failure to cut 50 percent.[30] The 50 percent guideline was not absolute. It was subject to broad exceptions for market and other developments

after award of the contract and for other considerations advantageous to the United States.

Plaintiff is in error in its argument that Forest Service standards applicable to the timber sale limited extensions to a period of 1 year. The FSM in effect at the time the timber sale was executed specified no time limit for extensions,[31] and the provision in effect at the time of the extension allowed extensions of longer than 1 year "if justified in a specific situation." [32] The contract extension ultimately approved by the Forest Service included a 2-year period beyond the December 31, 1974, expiration date of the original contract. The final extension, executed on December 31, 1975, had been preceded by three conditional extensions, lasting for periods from 3 months to 7 months each. The conditional extensions were appropriate to accommodate the requirements mandated by the environmental statement. The term of the extensions accorded with Forest Service policies then in effect; extensions could be longer than 1 year "if justified in a specific situation."

■ Plaintiff asserts defendant failed to consult about the extension of the contract in violation of the requirement in ANCSA's policy statement, 43 U.S.C. § 1601(b). That provision does not confer on the native corporations a veto power over Forest Service management of withdrawn or selected lands. The policy calls for consultation with the natives during decision-making associated with forest management under existing laws, and for consultation with native corporations and consideration of their

**28.** *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Glidden Co. v. Zdanok,* 370 U.S. 530, 541, 82 S.Ct. 1459, 1468, 8 L.Ed.2d 671 (1962).

**29.** *Everett Plywood Corp. v. United States,* 512 F.2d 1082, 1088–90, 206 Ct.Cl. 244 (1975).

**30.** FSM § 2433.11 (Apr. 1960) provided:
"For extensions requested just prior to the termination date of a contract, a purchaser should expect to have *-cut-* at least 50 percent of the timber by the date of his application for extension and to have constructed sufficient specified roads under contract section 10 b to ser-

vice at least 60 percent of the timber to be cut, including all roads which are planned or needed as access routes for other national forest timber, except when cutting or lesser amounts or lesser road construction is justifiable because of lowered lumber prices, reduced market demand, or other comparable developments subsequent to the contract award. Unless there are other considerations advantageous to the United States, extension applications which fail to meet this standard will not be considered."

**31.** FSM § 2433.11 (Apr. 1960).

**32.** FSM § 2433.12 (Apr. 1974).

views prior to entering into a new contract concerning withdrawn lands. Except for lands in native reserves or reservations which existed prior to ANCSA, consent of the natives is not required. No requirement for consultation directly applicable to extension of a contract predating ANCSA appears in the regulations.

The Forest Service made substantial efforts to consult with the potentially affected native corporations in connection with the Devil's Club No. 2 sale. During the latter half of 1974, when the decision to extend began to be actively considered, the Forest Service made several unsuccessful attempts to contact the president of Cape Fox to discuss the proposed extension and modification. Prior to filing its selection on December 12, 1974, the president of Cape Fox met with the Forest Supervisor concerning the proposed extension and modification of the sale and did not indicate any objection to extension. The efforts made by the Forest Service to obtain the views of Sealaska and Cape Fox regarding the extension and modification of the Devil's Club No. 2 contract, were continuing and reasonable.

*Taking Claim*

█ Plaintiff's taking claim is dependent upon the nature of the property interest that accrued under ANCSA on the selection date. Plaintiff views the filing of the selection documents on December 12, 1974, as the creation of a right to immediate possession of the land, with attendant equitable and enforceable rights that are not subject to interference from third parties or from the United States.

█ It is clear that on the selection date Cape Fox did not acquire legal title or a right to immediate possession. Legal title under ANCSA does not vest until conveyance; the right to possession does not accrue until completion of the numerous pro-

cedural steps mandated in the statutory scheme. In the period between selection and conveyance, Congress deliberately permitted defendant's authority to manage withdrawn lands to continue unimpaired. This authority includes the power to let new contracts and to extend existing contracts. ANCSA makes no special provision for lands that have been selected but not conveyed.

█ ANCSA establishes a procedure for selection and conveyance of lands to the regional and village corporations. Until those procedures are completed and the land is formally conveyed, the native corporations had a contingent interest that was subject to compliance with the settlement scheme. It was not a vested property interest eligible for compensation under the 5th amendment.

The interest not only was contingent, to some extent, over-selection made it speculative. Most of the lands selected by the regional and village corporations never will be conveyed. Further, any interest that vests on conveyance, is required to be subject to all valid existing rights, including contracts and leases.

█ Plaintiff argues that, upon completion of the selection process, ANCSA provides that the lands were to be conveyed "immediately"[33] and points to the federal land grant cases for the proposition that selection provided equitable and enforceable rights to the timber sale tract.[34] The land grant cases do not support plaintiff's argument. The rights of an applicant for land from the Government depend entirely upon the statutory scheme invoked.[35]

ANCSA embodies a congressional scheme that is entirely different from the situation that was addressed by the land grant statutes. The land grant cases cited by plaintiff were involved with the Government's power to alienate title to property so as to

---

**33.** 43 U.S.C. 1613(b).

**34.** *Wyoming v. United States*, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1924); *United States v. Northern Pacific Railway Co.*, 256 U.S. 51, 41 S.Ct. 439, 65 L.Ed. 825 (1924).

**35.** *Andrus v. Idaho*, 445 U.S. 715, 100 S.Ct. 1450, 63 L.Ed.2d 739 (1980).

derogate from the rights of an applicant who had taken steps to receive a grant after entry on unoccupied, unreserved, or unappropriated lands. ANCSA is concerned with interim management by the Federal Government under ongoing authority of lands that were subject to outstanding rights and reservations. ANCSA affirmatively directs the Secretaries to manage selected lands under existing rules and regulations.

The word "immediately" in ANCSA cannot be construed as literally as plaintiff contends. ANCSA, in 43 U.S.C. § 1613(b), does not require instantaneous conveyance after selection; conveyance must be within a reasonable time within the statutory scheme.[36]

Plaintiff's property interest acquired on the selection date was contingent and speculative. The extension of the timber sale contract was authorized under ANCSA. It did not amount to a taking of property that was compensable under the 5th amendment.[37]

Plaintiff also argues that the due process clause in the 5th amendment was violated because notice to plaintiff was inadequate. The Court of Claims consistently has held that there is no jurisdiction over claims for money based upon the Government's alleged violation of the due process clause.[38]

## CONCLUSION

The United States has waived sovereign immunity with respect to plaintiff's claims, and this court has jurisdiction under 28 U.S.C. § 1491(a) as to those claims. The

just compensation clause of the 5th amendment was not infringed by the extension of the Devil's Club No. 2 timber sale, and plaintiff has failed to establish any violation of statute or regulation upon which relief can be granted. Plaintiff's motion for partial summary judgment is denied, defendant's motion for summary judgment is allowed, and plaintiff's petition (now complaint) will be dismissed.

---

36. The Alaska district court reached the same conclusion. The court cited the 1976 escrow amendment as a solution for delayed conveyance:

"In providing a solution (to delayed conveyances) other than the immediate conveyance of selected lands, Congress surely must have intended to apply the reasonable time interpretation. Congress adopted the escrow mechanism to protect the contingent interests of the Native corporations in the particular tracts of withdrawn land rather than compelling immediate conveyance." 456 F.Supp. at 805.

37. *Freese v. United States,* 639 F.2d 754, 226 Ct.Cl. 252 (1981); *Appalachian Power Co. v. United States,* 607 F.2d 935, 221 Ct.Cl. 398 (1979).

38. *Inupiat Community of the Arctic Slope v. United States,* 680 F.2d at 132; *Conservative Caucus, Inc. v. United States,* 650 F.2d 1206, 228 Ct.Cl. 45 (1981); *Mack v. United States,* 635 F.2d 828, 225 Ct.Cl. 187 (1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981).