## N.A. CORPORATION OF WASHINGTON, et al.

v.

## The UNITED STATES.

No. 4–82L.

United States Claims Court.

April 12, 1984.

---

Jonathan M. Weisgall, Washington, D.C., for plaintiffs.

James T. Draude, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

HARKINS, Judge.

Plaintiffs' petition was filed in the United States Court of Claims on January 5, 1982, and amended on February 3, 1982, to obtain judgment for an amount equal to 1 percent of the National Theatre's gross receipts between 1979 and 1994, plus the present value of the right to select two attractions per year to play at the National Theatre. The case was transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982. 28 U.S.C.A. § 171 note (1983). The case now is before the court on cross-motions for summary judgment, and a comprehensive stipulation of facts; oral argument was heard on June 1, 1983.

The essential facts are not in dispute. N.A. Corporation of Washington (N.A. Corp.), incorporated July 30, 1970, acquired on August 24, 1970, a lease on the National Theatre premises (but not the entire National Theatre building) for a term that extended to April 30, 1994. The seven story National Theatre building homes the National Theatre on its lower floors, and offices on its upper floors. The National Theatre building is located on Lot 804, in Square 254, which is bounded by 13th Street, 14th Street, E Street, and F Street, N.W., in Washington, D.C. As amended on October 7, 1974, and March 9, 1978, the lease required rental payments of $70,200 per year through April 30, 1982, and $76,-200 per year for the balance of the lease term. The lease included the following eminent domain clause:

Section 1. If a whole or such portion of the premises herein leased shall be taken by any public authority under the powers of eminent domain, which will result in preventing a full economic use of the premises as intended by this Lease, then the term of this Lease shall

cease on the part so taken from the day the possession of that part shall be required for any public purpose and the rent shall be paid up to that day and the Tenant shall receive a refund of all prepaid rent, if any, and the security deposit, less any offsets, if any, and from that day this Lease shall immediately be cancelled and null and void without notice to any party. All damages awarded for such taking shall be determined by a court of competent jurisdiction or otherwise and shall belong to the Landlord, except that the Tenant shall be entitled to prosecute its own claim against the condemning authority for its loss of business by reason of the condemnation.

On November 18, 1974, N.A. Corp. sublet the National Theatre premises to the New National Theatre Corporation (NNTC), for a term that extended to April 30, 1994. Under the sublease, NNTC agreed to pay N.A. Corp. an annual rental of $70,200 through April 30, 1982, and $76,200 for the balance of the term. NNTC also agreed to pay as additional rental a percentage of gross income, which, after August 7, 1978, was a flat 1 percent of the National Theatre's annual gross income. The sublease also entitled N.A. Corp. to select two attractions to play at the National Theatre during each "percentage rent year," a 12-month period beginning on July 1, of each year. The sublease agreement obligated NNTC to use the leased premises solely for the operation of a theatre, and theatre-related concessions. The sublease agreement included an eminent domain clause in which Section 1, applicable to the Sublessor and Sublessee, was identical.

On April 13, 1979, the Pennsylvania Avenue Development Corporation (PADC) acquired fee title to the National Theatre site and the adjoining Munsey building site, and all improvements located thereon, by initiating a direct condemnation proceeding in the United States District Court of the District of Columbia, pursuant to the Pennsylvania Avenue Development Corporation Act, 40 U.S.C. §§ 871 et seq. (1976). Named defendants in the condemnation action included, inter alia, N.A. Corp. and

NNTC. The acquired land was owned in fee by the National Press Building Corporation (NPBC); the buildings on the sites were owned by National-Munsey Joint Venture (National-Munsey), which had leased the land from NPBC. Prior to institution of the condemnation proceedings, PADC, NPBC and National-Munsey agreed that the total price for the acquisition would be $7,250,000. NPBC and National-Munsey, however, were unable to agree on an allocation between themselves. N.A. Corp. did not participate in the discussions that lead to that agreement.

N.A. Corp. did not receive actual notice of the condemnation action until late 1979 or January 1980. On April 1, 1980, N.A. Corp. filed an answer that challenged PADC's authority to condemn the National Theatre on three grounds: (1) the taking violated Section 8(d) of the PADC Act, (2) the taking was unconstitutional because not necessary for the public interest, and (3) the National Theatre already was devoted to public use. On a motion by PADC to strike N.A. Corp.'s answer, the district court on April 30, 1980, ordered that all defenses set forth in the answer be stricken. The court's memorandum opinion stated in part:

> Defendant [N.A. Corp.] argues that the development plan upon which plaintiff's declaration of taking is founded violates 40 U.S.C. § 877(d) ... in that plaintiff [PADC] has granted preference to a private entity other than defendant with respect to the leasing and operating rights of the National Theatre.

> .    .    .    .    .

> Accepting for purposes of this motion that defendant's allegations are true, the Court concludes that they do not present questions of law or fact sufficient to serve as a defense to plaintiff's authority to condemn the property at issue herein. In the Court's view, such allegations, if proven, may provide the basis for a separate cause of action.

N.A. Corp. timely filed, on May 23, 1980, a notice of appeal. On December 23, 1980,

N.A. Corp. filed a motion for voluntary dismissal of the appeal without prejudice, which was granted on January 13, 1981.

On April 18, 1980, the district court in the condemnation action awarded $5,130,-000 to NPBC and $2,120,000 to National-Munsey. On appeal, this allocation was disallowed, and remanded for further proceedings. *PADC v. One Parcel of Land,* 670 F.2d 289 (D.C.Cir.1981). On March 11, 1982, on stipulation of the parties, the district court entered judgment awarding $4,615,000 to NPBC and $2,635,000 to National-Munsey. In the condemnation action, N.A. Corp. did not ask for and did not receive any compensation for the taking of its interest in the National Theatre.

Acquisition and development of Square 254 is part of the Pennsylvania Avenue Development Plan, which became effective in May 1975. 40 U.S.C. § 874; *Don't Tear It Down, Inc. v. PADC,* 642 F.2d 527, 529 (D.C.Cir.1980). Square 254 Limited Partnership (Square 254 Ltd.), a limited for-profit partnership, is the developer under the Plan pursuant to an October 25, 1978, selection by PADC. Quadrangle Development Corporation, Marriott Corporation and the Aetna Casualty and Surety Company are general partners in Square 254 Ltd.

After the April 13, 1979, declaration of taking, NNTC continued to occupy the National Theatre premises and operate the theatre under an agreement with PADC for temporary use and occupancy. The National Theatre has not been demolished; the theatre is still located in the same building at the same location. On September 12, 1979, PADC leased Square 254, together with improvements thereon, to Square 254 Ltd. for 99 years. The lease agreement requires Square 254 Ltd. to renovate and make improvements to the National Theatre building, to continue operation of the National Theatre as a first class legitimate theatre, and to lease the National Theatre to an operator for a minimum term of 35 years. On September 12, 1979, Square 254 Ltd. sublet the National Theatre premises to NNTC.

On July 21, 1981, NNTC filed suit in the Superior Court of the District of Columbia against N.A. Corp. to recover the security deposit and rentals paid under the November 18, 1974, sublease after the April 13, 1979, condemnation of the National Theatre. On March 12, 1982, the Superior Court granted NNTC summary judgment on the sublease claims, and gave N.A. Corp. leave to file a counterclaim and to add additional parties as counterclaim defendants. On April 7, 1982, N.A. Corp. filed a counterclaim that included among the counterclaim defendants, NNTC, PADC, and Square 254 Ltd. The counterclaim charged that PADC's failure to grant N.A. Corp. "a preferential right to lease the National Theatre constitutes a violation of Section 8(d) of the PADC Act, 40 U.S.C. § 877(d)." PADC removed the action to the District Court for the District of Columbia. On October 27, 1984, pursuant to a stipulation of dismissal by the parties, the counterclaims as to NNTC were dismissed with prejudice, and as to PADC and Square 254 Ltd. were dismissed without prejudice. *NNTC v. N.A. Corp.,* Civ. No. 82–1172 (D.D.C. Oct. 27, 1982).

N.A. Corp., its president and vice-president, plaintiffs in this court, claim: (1) that PADC violated Section 8(d) of the PADC Act by failing to grant plaintiffs a preferential right to protect their leasehold interest in the National Theatre and by granting a preference to NNTC, and (2) that PADC's failure to compensate plaintiffs for the loss of business plaintiffs suffered as a result of the condemnation constitutes a taking of plaintiffs' property rights in the National Theatre without just compensation in violation of the fifth amendment.

## DISPOSITION

Section 8(d) of the PADC Act (40 U.S.C. § 877(d)) provides:

(d) Owners and tenants of real property whose residence, or retail, wholesale, service or other business is terminated as a result of acquisitions made pursuant to this Act shall be granted a preferential right to lease or purchase from the Cor-

poration [PADC] or its agent such like real property as may become available for a similar use upon implementation of the development plan. Any such preferential right shall be limited to the parties in interest and shall not be transferable or assignable.

On April 13, 1979, the condemnation date, N.A. Corp. was a tenant of real property by virtue of its August 24, 1970, lease from National-Munsey, and it was engaged in a business for profit in conjunction with that lease which was terminated by an acquisition pursuant to the Act. Accordingly, plaintiffs became eligible for the preferential rights provided in Section 8(d).

■ The preferential rights conferred by that section, however, do not include a remedy that may be obtained in the Claims Court, or in its predecessor, the Court of Claims. This court's jurisdiction under the Tucker Act, now embodied in 28 U.S.C. § 1491(a)(1), includes a waiver of sovereign immunity for "any claim against the United States founded upon .... any Act of Congress" for money damages. *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). The Tucker Act, however, does not create any substantive right enforceable against the United States for money damages, and such substantive right must be found in some other source of law. The Supreme Court summarized the content of the Tucker Act jurisdiction in 28 U.S.C. § 1491(a)(1) as follows:

Thus, for claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. In undertaking this inquiry, a court need not find a separate waiver of sovereign immunity in the substantive provision, just as a court need not find consent to suit in "any express or implied contract with the

United States." Ibid. The Tucker Act itself provides the necessary consent. 463 U.S. at ——, 103 S.Ct. at 2968.

■ When inquiry is made into the separate statutory source of substantive law, here, 40 U.S.C. § 877(d), it is not necessary to apply the standards of strict construction that are appropriate to waivers of sovereign immunity. *Cape Fox Corp. v. United States,* 4 Cl.Ct. 223, 231 (1983). It is essential, however, that, when fairly interpreted, the statutory source authorizes monetary compensation by the United States for the damages sustained. The statute must do more than provide a ground for some form of specific relief, (e.g., an injunction to secure a preferential right to lease or purchase like real property); it is necessary also that the substantive right granted by Congress extend to entitlement to compensation or money damages. *Mitchell v. United States,* 664 F.2d 265, 268 (Ct.Cl.1981).

Section 8(d) by its terms does not mandate payment of money, and it does not confer a substantive right to recover money damages. No provision of the PADC Act indicates, much less "mandates," that money damages are to be provided for a failure to grant the preferential rights conferred by Section 8(d) with respect to "like property as may become available for a similar use upon implementation of the development plan."

One purpose of the PADC Act was to remove fragmented ownership in order to develop a large area cohesively in accord with the approved, congressional plan. 40 U.S.C. §§ 871(c), 874(a), and 875(6) (1976). Whatever the authority might be in another court to remedy a failure to grant a "preferential right," it is clear that the judicial remedy available to plaintiffs for the failure to implement the preferential rights in Section 8(d) is not within the jurisdiction conferred by the Tucker Act.

When the declaration of taking was filed on April 13, 1979, complete title to the site and the National Theatre building vested in PADC, and the property interests of all other persons and entities were extin-

guished. 40 U.S.C. § 875(6); D.C.Code § 16–1353 (1973); 6A Nichols on Eminent Domain § 27.25[1] (3d ed. 1981). The eminent domain clauses in the August 24, 1970, lease from National-Munsey and N.A. Corp.'s November 18, 1974, sublease with NNTC became effective on April 13, 1979, and the tenancies became null and void in accordance with the terms of the clauses. As between the parties, all damages for the taking belonged to the Landlord or the Sublessor. The right of the tenant or sublessee to prosecute its own claim against the condemning authority for loss of business was preserved in both instruments.

N.A. Corp. was a named defendant in the condemnation action. Although plaintiffs did not receive actual notice of the condemnation action until late, its notice was prior to trial and to the April 18, 1980, decision of the district court. Plaintiffs' position in the district court proceedings was to challenge the basic authority of PADC to condemn; it did not assert, as it could have, a right to compensation. The district court in its ruling addressed only the issue of PADC's authority to condemn; it did not suggest that plaintiffs could maintain an action in another court for a fifth amendment taking.

■ Defendant raises the bar of the doctrine of res judicata. Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). PADC is a wholly owned government corporation. The United States is in privity with PADC and can assert the res judicata effect of the judgment in the condemnation action. Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceedings. *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940); 1B Moore's Federal Practice ¶ 0.405[1] (2d ed. 1983). "The doctrine is applied strictly;

the fact that a person will never have his day in court on a certain issue will not, by itself, bar the application of the doctrine." *Red Lake Bank v. United States*, 667 F.2d 73, 74, 229 Ct.Cl. 272 (1981).

Since plaintiffs' claim could have been raised in the condemnation action, the doctrine of res judicata applies. Further litigation in this court on a theory of inverse condemnation is barred by that judgment.

On the basis of the foregoing, plaintiffs' motion for summary judgment is denied, defendant's cross-motion is allowed, and the petition, now complaint, will be dismissed.