CHENEGA CORPORATION, Port Graham Corporation, and English Bay Corporation, Appellants and Cross–Appellees,

v.

EXXON CORPORATION and Exxon Shipping Corporation, Appellees and Cross–Appellants.

Nos. S–7252, S–7512.

Supreme Court of Alaska.

Nov. 22, 1999.

---

Samuel J. Fortier, Fortier & Mikko, P.C., Anchorage, and Kenneth F. McCallion, Goodkind Labaton Rudoff & Sucharow LLP, New York, New York, for Appellants and Cross–Appellees.

Douglas J. Serdahely, Bogle & Gates, P.L.L.C., Anchorage, John F. Clough III and Eric Twelker, Clough & Associates, P.C., Juneau, Charles P. Diamond and M. Randall Oppenheimer, O'Melveny & Myers, Los Angeles, California, for Appellees and Cross–Appellants.

Before BRYNER, Justice, RABINOWITZ, Senior Justice, pro tem,* HUNT, GREENE, and ZERVOS, Justices, pro tem.**

## OPINION

BRYNER, Justice.

A jury awarded several Alaska Native corporations almost $6,000,000 for harm caused by the EXXON VALDEZ oil spill. Exxon and the corporations appeal, raising numerous issues. We affirm in all respects but one: The superior court determined that the Oil Pollution Act of 1990 did not assign to the corporations certain federal claims for spill-related harm to federal lands that the corporations had selected under the Alaska Native Claims Settlement Act but that the federal government had not yet conveyed to them. Because we conclude that the Oil Pollution Act did assign these federal claims to the

corporations, we hold that the superior court erred in precluding their consideration by the jury.

## I. FACTS AND PROCEEDINGS

In the early morning hours of March 24, 1989, the EXXON VALDEZ, owned by the Exxon Shipping Corporation, ran aground near Bligh Reef in Prince William Sound, spilling approximately ten million gallons of crude oil owned by the Exxon Corporation. Currents and winds pushed the spilled oil in a southwesterly direction onto the shores of lands owned by several Alaska Native corporations, including Chenega Corporation, Port Graham Corporation, and English Bay Corporation (the Corporation). Each of the Corporations is an Alaska Native corporation organized under the Alaska Native Claims Settlement Act (ANCSA);[1] collectively, they own more than 250,000 acres of wilderness land along western Prince William Sound.

Within a month of the oil spill, the Corporations filed suit in Alaska superior court against the Exxon Shipping Corporation and Exxon Corporation (collectively, Exxon) and the Alyeska Pipeline Service Company (Alyeska). The Corporations alleged that the oil spill affected their lands and damaged coastal archeological sites containing irreplaceable historical evidence of Native people who had used and occupied these lands for thousands of years. They sought compensation on various theories of liability for damage to their real property and archeological sites and artifacts. In September 1990 the trial court entered an order holding Exxon strictly liable for damages proximately caused by the oil spill.

Also in 1990, Congress responded to the oil spill by enacting the Oil Pollution Act of 1990 (OPA 90). Although OPA 90 focuses on preventing oil spills and creates a fund to enable faster response to oil spills,[2] one section of the act, section 8301,[3] vests Alaska Native

---

* Sitting by assignment made pursuant to article IV, section 11 of the Alaska Constitution.

** Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

**1.** See 43 U.S.C. §§ 1601–29f (1986 & Supp. 1998).

**2.** See generally S.Rep. No. 101–94, 101–99 (1989), reprinted in 1990 U.S.C.C.A.N. 723–49, 750–78.

**3.** Section 8301 of OPA 90 is codified as 43 U.S.C. § 1642 (Supp.1998).

corporations with "right, title and interest" to pursue claims arising from the EXXON VALDEZ oil spill that related to federal lands selected by the corporations but not yet conveyed to them under ANCSA.

In 1991, upon learning that the United States and State of Alaska were about to settle spill-related claims with Exxon in federal court, the Corporations intervened in the federal action, seeking injunctive relief to protect their own state-court claims from being impaired. In September 1991 the federal and state governments responded by entering into a consent decree recognizing that the Corporations retained "private claims ... for all private harms" caused by the oil spill to OPA 90 section 8301 lands.[4]

Before trial the Corporations obtained compensation for spill damage from two alternative sources: In 1991 the Corporations filed claims for damages with the Trans–Alaska Pipeline Liability Fund (TAPL Fund or Fund); the Fund paid them $23,266,884 in settlement of their claims. In 1993 Exxon's codefendant Alyeska entered into a settlement, paying the Corporations $5,689,079 in exchange for a release of liability.

Thereafter, the superior court dismissed the Corporations' state punitive damages claims in deference to a federal court order creating a federal mandatory punitive damages class. The court then held a jury trial on the remaining claims. During trial and at the close of the evidence Exxon moved for a directed verdict. The court denied the motions. The jury returned a verdict totaling $5,915,741.87 for the Corporations.[5]

The superior court decided to offset TAPL's and Alyeska's pretrial payments against the jury awards. Because the offsets exceeded the jury verdict, the court entered final judgments ordering that the Corporations "take nothing" from Exxon. Exxon moved for a judgment notwithstanding the verdict, but the court denied this motion.

The Corporations appeal, and Exxon cross-appeals.

## II. DISCUSSION

### A. Instructional Errors

#### 1. Standard of review

■■■ The legal sufficiency of jury instructions is a question of law to which this court applies its independent judgment.[6] A legally erroneous instruction warrants reversal only when it prejudices a party[7]—that is, when "substantial rights of the parties were affected or the error had substantial influence."[8]

---

**4.** The consent decree, which the parties have referred to as the "Lujan Decree," was entered in *Native Village of Chenega Bay et al. v. State of Alaska and United States,* No. A91–454 Civ. (D.Alaska Sept. 24, 1991). The decree recognized, in relevant part, that the Corporations had retained

> [t]he right to the exclusion of the [federal and state governments] to pursue private claims ... for all private harms resulting from injuries caused by the Oil Spill, to lands either, (a) legally owned by it; or (b) deemed to have vested in the respective Alaska Native Corporation[s] in accordance with the provisions of Sec[tion] 8301 of the Oil Pollution Act of 1990. Such claims include those for lost or diminished land values, for preservation, protection and restoration of archaeological or cultural resources and archaeological sites found on lands described in this paragraph, for private harms resulting from injuries to natural resources found on lands described in this paragraph, for impairment of riparian or littoral rights, if any, and any other claims that are available to [the Corporations] as private landowners.

**5.** The jury apportioned the damages as follows:

| | Land Damages | Archeological Damages |
|---|---|---|
| Chenega | $3,186,934.41 | $ 665,120.62 |
| English Bay | 225,821.55 | 797,598.89 |
| Port Graham | 284,810.38 | 755,456.02 |
| Totals: | $3,697,566.34 | $2,218,175.53 |
| Aggregate Total: | | $5,915,741.87 |

**6.** See *City of Kenai v. Burnett,* 860 P.2d 1233, 1241 n. 17 (Alaska 1993).

**7.** See *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 114 (Alaska 1992); *see also Sever v. Alaska Pulp Corp.,* 931 P.2d 354, 361 n. 11 (Alaska 1996).

**8.** See *Vincent by Staton v. Fairbanks Mem'l Hosp.,* 862 P.2d 847, 853 n. 11 (Alaska 1993); *see also* Alaska R. Civ. P. 61 (requiring that the reviewing court disregard defects in lower-court proceedings which do not affect the "substantial rights of the parties").

When evidence supports a plaintiff's theory of the case, the court must ordinarily give an instruction "consonant with the theory."[9] Furthermore, if it appears from questions submitted by the jury to the court that the jury is confused on a legal issue and "the resolution is not apparent from an earlier instruction, the trial judge has a responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria."[10] But so long as the jury instructions given are adequate, the trial court has broad discretion to decide upon the need for additional instructions responding to jury questions, summarizing potentially helpful statutory provisions, or describing the plaintiffs' theory of the case.[11] Its decision in such cases is subject to review only for abuse of discretion.[12]

### 2. The court did not abuse its discretion in instructing on the Corporations' theory of land damages.

The Corporations argue that the superior court erred in instructing the jury that it could award land-use damages only for loss of "actual use" of corporate lands. Citing the Restatement of Torts, they claim that they should not have been required to prove any actual lost monetary use of the damaged lands.[13] They also claim that the court erred in restricting the jury's consideration of fair market value and in failing to instruct on their specific theory of damages. Before addressing these claims, we will briefly describe the procedural background from which they arise.

#### a. Background

The Corporations sought damages for the reduced market value and loss of use of their oiled and adjacent lands. They asserted several theories of liability, including trespass, private nuisance, and violation of Alaska's strict-liability statute prohibiting release of hazardous substances.[14] The Corporations presented expert testimony at trial in support of these damages theories. To establish the value of the Corporations' lost use, the Corporations' experts relied on the concept of impaired rental value. They began by positing that the "highest and best use" of the lands was preservation as natural land or archeological sites. After determining the market value based on sales of comparable property, the experts converted this value into a projected annual income stream representing estimated rental value. They then multiplied this income stream by the projected number of years of impairment and discounted to present value.

This process yielded the unimpaired value of the affected lands. The experts then calculated the impaired rental value of the lands by multiplying the unimpaired value by an impairment factor derived from the ratio of soiled to unsoiled acreage. Finally, by subtracting impaired from unimpaired values, they arrived at an estimated value of lost-use damages. Exxon's experts acknowledged that the "income stream" method of valuation is commonly used by appraisers in valuing coastal Alaska properties.

Near the end of trial, in a hearing on jury instructions, the Corporations acknowledged that essentially all of the land damages they sought were temporary. They agreed to submit their land-damages claims to the jury as temporary lost-use claims rather than as claims for permanent reduction in market

---

9. *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 201 (Alaska 1980) (quoting *Putensen v. Clay Adams, Inc.*, 12 Cal.App.3d 1062, 91 Cal.Rptr. 319, 334 (1970)).

10. *Des Jardins v. State*, 551 P.2d 181, 189–90 (Alaska 1976) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946) (internal quotations omitted)).

11. *See Shane v. Rhines*, 672 P.2d 895, 901 (Alaska 1983) (no abuse of discretion in refusing to instruct on statutes not applicable to controversy); *Clary*, 620 P.2d at 201 (no abuse in instruct-

ing on two similar theories of negligence, despite possible jury confusion, where theory supported by evidence); *Des Jardins*, 551 P.2d at 189–90 (no abuse where judge refused to answer jury's questions, though answer would have been "desirable," where earlier instruction was "sufficiently clear on th[e] issues").

12. *See Shane*, 672 P.2d at 901.

13. *See* Restatement (Second) of Torts § 931 at 551 (1977).

14. *See* AS 46.03.822.

value. This approach was consistent with the methodology adopted by the Corporations' experts, who relied on fair market value as a starting point for calculating annual rental value of corporate lands but did not use reduction in fair market value as a valuation component.

Despite their agreement to limit their claims for land damages to temporary lost use, the Corporations requested permission to refer in closing argument to testimony describing the lost market value of spill-affected lands belonging to other owners. They maintained that the reduced market value of nearby properties tended to support their claims of lost use as to their corporate lands. Exxon objected, contending that reduced market value was no longer a valid measure of the Corporations' alleged land damages. But the superior court granted the Corporations' request, ruling that each party could argue its own interpretation of the evidence.

After closing arguments, the trial court instructed the jury that the Corporations' "first item of claimed loss is damages to real property." [15] As to this item, the court stated, "The measure of harm to land, in the circumstances of this case, is the 'fair rental value' attributable to any use of the property that could have been made but for the Oil Spill." After defining the concept of "fair rental value" as "the amount of rent that the plaintiff would receive from a fully informed renter ... in an open rental market," the court, in Jury Instruction No. 27, cautioned against using other measures of damage, such as impaired marketability or reduction in market value:

Plaintiffs are not asserting any of the following as a basis for any of their claims and, therefore, you may not award damages for:

1. Any alleged harm to plaintiffs' ability or right to sell or lease any of their property, as a result of the Oil Spill;

2. Any alleged reduction in the market value of any of their properties as a result of the Oil Spill.

Neither harm to plaintiffs' ability or right to sell or lease, nor reduction in the market value of any of their properties is a lost use for which you may award damages.

On the second day of deliberations, the jury expressed confusion concerning the Corporations' land-damages claim. First, the jury asked for the transcribed testimony of Dr. Wilbur Mundy, an expert for the Corporations who had described their theory of damages and had estimated the lost fair rental value to their damaged lands. Shortly thereafter, apparently referring to Instruction No. 27, the jury sent the court another note, this time asking:

If "harm to [the Corporations'] ability or right to sell or lease" is not a lost use (for which we may award damages), there is then some unclarity as to what *is* lost use. What *are* [the Corporations] asserting?

Just before retiring that evening, the jury voiced similar concerns in three further questions:

Is damage to [ ]*Market Value* of real property[ ] *actual* damage to real property[?]

Can we award damages for mere loss of market value ( [f]or whatever cause) or only when actual use is lost, as a result of the Spill?

Is that what Inst[.] No. 27 mean[s]?

Upon learning of these questions, the Corporations proposed supplemental instructions that would inform the jury of numerous claimed uses, indicating in part that "[i]t is not necessary to have previously engaged in each of the uses in order to recover for their loss," and stating that although "[r]ental value is how the law requires you to calculate the value of [the Corporations'] lost uses, [h]arm to [their] ability or right to sell or lease their lands is evidence of the damage to the lands because of lost use." [16]

---

15. Jury Instruction No. 21 stated, in relevant part: "The items of loss claimed by the plaintiffs are the following: (1) The first item of claimed loss is damages to real property; (2) The second item of claimed loss is for damage to archeological resources."

16. In a similar vein, the Corporations submitted another proposed supplemental instruction stating, in relevant part:

1. Plaintiffs are claiming that the spill interfered with the use and enjoyment of their land in a number of respects....

Exxon opposed these supplemental instructions and submitted three proposed supplemental instructions of its own—one responding to each of the jury's three questions. For the most part, Exxon's proposed supplemental instructions simply restated information contained in the court's original instructions. After hearing extensive argument on the issue, the trial court determined that the Corporations' proposed supplemental instructions did not adequately explain the "component nature" of fair market value in regard to loss of use damages in Dr. Mundy's testimony. Accordingly, the court approved Exxon's proposed instructions but gave the Corporations one more opportunity to add language stating the relevance of fair market value under their theory of damages.

The Corporations then proposed that the following sentence be added to Exxon's supplemental instructions: " Lost market value may be considered by you as evidence of lost or impaired use and as a factor in calculating lost rental value." Exxon objected that this language would only confuse the jury because the Corporations' experts had not used reduction of market value to calculate lost rental value.

The court agreed with Exxon, rejected the Corporations' proposed supplemental language, and elected to give Exxon's proposed supplemental instructions without revisions. These instructions, which the court designat-

ed as Supplemental Instructions Nos. 5, 6, and 7, reminded the jury that "fair rental value" was the appropriate measure of damages for lost use of corporate lands; they again cautioned against using reduced market value as a measure of lost use; and they defined "lost use" to include any "legal and practical" use the Corporations "could have made of [their] property in the absence of the oil spill." [17]

After receiving the supplemental instructions, the jury awarded more than $3.6 million to the Corporations, cumulatively, for land damages.

b. *The trial court did not abuse its discretion in instructing the jury on property damages.*

■ The Corporations contend that the supplemental jury instructions erroneously required loss of "actual use" for recovery of land damages. We disagree. As should be clear from the above background discussion, neither the original nor the supplemental instructions limited the Corporations' lost-use claims to "actual" lost uses.

Among the original instructions, Jury Instruction No. 23 expressly provided that "[t]he measure of damages for harm to land ... is the 'fair rental value' attributable to *any use of the property that could have been made* but for the Oil Spill." [18] Supplemental Instruction No. 5 echoed the original instruc-

. . . .

3. If you find that the oil spill impaired such uses, damages should be computed by determining the "fair rental value" of the property for the period of impaired or lost use. . . .

4. The owner is entitled to the fair rental value of the land during the period of impairment even if he never may have actually used or would not have actually used the land during the period of impairment.

5. If you find that there was a reduction in the market value of the plaintiffs' lands as a result of the spill and cleanup activities, even though plaintiffs do not base their claim for lost use on reduction in market value, you may consider the reduction as a factor in deciding whether there were or were not lost uses of the land, and, if so, the magnitude of the lost uses.

**17.** For the full text of these supplemental instructions, *see infra* note 21.

**18.** (Emphasis added.) Likewise, while Jury Instructions Nos. 25 and 26—which dealt more narrowly with lands selected by the Corporations

under ANCSA but not yet conveyed—required the Corporations to prove that they "could have used" or "were permitted to use the selected but not conveyed lands for which they [were] asserting claims," these instructions did not require proof that the claimed uses were actual uses.

Also notable is Jury Instruction No. 4, which dealt generally with Exxon's strict liability for damages legally caused by the oil spill and informed the jury that "your job will be to determine what, if any *actual damages* were caused to the plaintiffs by the discharge of oil from the *Exxon Valdez*." (First emphasis added.) The Corporations do not argue that this instruction's generalized reference to "actual damages" could reasonably be interpreted as requiring them to prove actual lost use to establish real property damages. In our view, such an interpretation would be unreasonable. Accordingly, we find that this instruction does not amount to plain error.

tion, stating that, although damages based on reduction in market value were not allowed, "[y]ou may award damages measured by the fair rental value attributable to *any use of the property that could have been made* but for the oil spill." [19] And Supplemental Instruction No. 6 defined "lost use" to include any use that the Corporations "could have made of [their] property in the absence of the oil spill." Simply put, these instructions did not require that lost uses be actual uses.

The Corporations nonetheless claim that these supplemental instructions were erroneous because they "took the 'market value' component from the jury's consideration, thus leaving the jury with no alternative but to believe that they could only award damages for lost 'actual use' by the Village Corporations." But as we have just observed, the supplemental instructions did not state or imply that lost-use damages could only be awarded for actual uses; instead, they encompassed any potential use of land that might have been permissible. And while they also specified that the appropriate measure of damages was the fair rental value of the lost use, rather than any reduction in the lands' market value, they did not preclude considering market value as a component in the Corporations' calculation of fair rental value.

The Corporations' argument blurs the distinction between "market value," on the one hand, and "loss of market value," "reduction in . . . market value," and "damage to market value," on the other. Supplemental Instructions Nos. 5 and 7 informed the jury that the Corporations were not making a claim for "damage to market value" and that the jury should not make an award for "mere loss of market value" or "damage to market value." [20] The concept of reduced, damaged, or lost market value played no role at all in the Corporations' calculation of rental value: original market value was the starting point for determining fair rental value; and impaired rental value was based on fair rental value and an impairment ratio, which was unrelated to the lands' reduced market value. Hence, removing reduced market value from the picture as a basis for awarding damages did nothing to preclude consideration of original market value as a component in calculating lost rental value.

The jury's three questions did indicate confusion as to the nature of the Corporations' lost-use claims and the manner in which the value of lost use should be measured. But the court directly answered each of the jury's questions with a concise, straightforward supplemental instruction that accurately restated and amplified the original jury instructions.[21] Because these instructions fully addressed and resolved the apparent confu-

19. (Emphasis added.)

20. *See infra* note 21.

21. The three jury questions and their corresponding supplemental instructions are as follows:

*Question 1*
(Sent at 9:55 a.m., 9/15/94)
 If harm to plaintiff's ability or right to sell or lease is not a lost use (for which we may award damages), there is then some unclarity as to what *is* lost use. What *are* the [plaintiffs] asserting?
SUPPLEMENTAL INSTRUCTION NO. 6
 This will respond to your note of 9:55 AM yesterday, September 15, 1994. A "use" of real property, for purposes of these instructions, means some purpose to which the property can be put that is legal and practical under all the circumstances. A lost use, for purposes of these instructions, means a "use" which a plaintiff has shown by a preponderance of the evidence it could have made of the property in the absence of the oil spill.

Plaintiffs are claiming that the oil spill interfered with their use of their property in a number of ways, as set forth in the evidence in the case.
 You are the sole judges of whether the evidence supports plaintiffs' assertions. You must determine from the evidence (1) whether plaintiffs could in fact have made use of their property in the manner they claim; (2) if so, whether such use was prevented or interfered with by the oil spill; and (3) what fair rental value someone would have paid for the use [of] the property that was prevented or interfered with.
*Question 2*
(Sent at 4:30 p.m., 9/15/94)
 Is damage to [ ]*Market Value* of real property, *actual* damage to real property[?]
SUPPLEMENTAL INSTRUCTION NO. 7
 In response to your question whether "damage to market value of real property [is] actual damage to real property," such damage can be actual damage to real property, but such damage is not being claimed here. Plaintiffs in this case are asserting claims for loss of use, mea-

sion, we find no abuse of discretion in the trial court's refusal to give different ones.

■ The Corporations also claim, however, that they were entitled to a supplemental instruction explaining their specific theory of damages because of the jury's confusion on the issue. But the supplemental instructions that the Corporations proposed on their theory were imprecise, overly broad, and one-sided.[22] For this reason, the superior court properly rejected these proposed instructions. Moreover, the Corporations had ample opportunity to discuss their theory in detail during closing arguments. Further elaboration would have shed little additional light on the topic; and by fixing the jury's attention narrowly and exclusively on the Corporations' version of damages, while ignoring Exxon's, the court might have encroached on the jury's fact-finding function.

■ Although we recognize that a plaintiff is generally entitled to an instruction "consonant with the theory of [the] case if such enjoys evidentiary support," [23] the trial court has broad discretion to determine what instructions should be given on the facts of the particular case at hand. Here, we hold that the court did not abuse its discretion in declining to submit the Corporations' additional proposed instruction on their theory of damages. We further hold that the superior court's supplemental instructions were not erroneous.

3. *The trial court did not abuse its discretion in refusing to instruct the jury that oil is a hazardous substance.*

■ The Corporations also argue that the trial court erred in refusing to instruct

---

sured by lost rental value as defined in Instruction No. 24.
*Question 3*
(Sent at 4:30 p.m., 9/15/94)
Can we award damages for mere loss of market value ([f]or whatever cause) or only when actual use is lost, as a result of the Spill? Is that what Inst[.] No. 27 mean[s]?
SUPPLEMENTAL INSTRUCTION NO. 5
This is in response to your question whether you can "award damages for mere loss of market value (for whatever cause) or only when actual use is lost, as a result of spill." As set forth in Instruction No. 27, you may not award damages for any alleged reduction in the market value of any of plaintiffs' properties as a result of the oil spill. You may award damages measured by the fair rental value attributable to any use of the property that could have been made but for the oil spill.

22. For example, the following proposed instruction described the Corporations' claims in sweeping terms that would have provided little specific guidance but might have been read as strongly favoring recovery:

This is a joint response to your questions from both 0955 and 1630 on September 15, 1994. I have consulted with counsel prior to responding to your questions. The first and second paragraphs that I will read to you are set forth as a description of plaintiffs' claims in this case. I remind you that it is your job, and yours alone, to evaluate the evidence and to decide whether the evidence supports Plaintiffs' claims. Paragraphs three, four and five contain supplemental instructions on the law.
1. Plaintiffs are claiming that the spill interfered with the use and enjoyment of their land in a number of respects. Plaintiffs claim that the oil spill and cleanup and remaining oil

disrupted their property rights by interfering with their right to quiet enjoyment, to use their lands free from fear, increased risk and uncertainty, their right of exclusive possession of their lands; interference with the ecosystem affecting the productivity of the lands (including subsistence resources) and natural beauty of the land; interference with littoral rights of the plaintiffs, including rights of free access, use and enjoyment of the sea; and other lost uses as described in the testimony of witnesses.
2. Kodiak Island Borough claims that its citizens and the general public have the opportunity to use its land for recreational purposes, such as sport fishing, hiking, hunting, kayaking, camping, picnicking, and enjoying the outdoor environment, and for subsistence purposes, such as fishing, hunting, clamming and other gathering activities.
3. If you find that the oil spill impaired such uses, damages should be computed by determining the "fair rental value" of the property for the period of impaired or lost use. See Instruction[s] No[s]. 22 and 24.
4. The owner is entitled to the fair rental value of the land during the period of impairment even if he never may have actually used or would not have actually used the land during the period of the impairment.
5. If you find that there was a reduction in the market value of the plaintiffs' lands as a result of the spill and cleanup activities, even though plaintiffs do not base their claim for lost use on reduction in market value, you may consider the reduction as a factor in deciding whether there were or were not lost uses of the land, and, if so, the magnitude of the lost uses.

23. *Clary Ins. Agency v. Doyle*, 620 P.2d 194, 201 (Alaska 1980).

that oil is a hazardous substance, contending that the instruction was needed to cure the prejudicial effect of testimony given by Exxon's appraiser, John D. Dorchester, Jr. But a trial court need only instruct on matters of law necessary to enable the jury to reach a verdict.[24] Given that Exxon, before trial, had conceded liability under AS 46.03.822 for unpermitted release of a hazardous substance, the statute's inclusion of oil as a "hazardous substance" for purposes of imposing strict liability was not as a matter of law necessary to the jury's verdict.[25] Nor did Dorchester's testimony create a necessity.

To impeach an unfavorable damage report that Dorchester had prepared before trial and had relied on as a basis for his trial testimony, the Corporations asked Dorchester on cross-examination to admit that when he wrote his report he did not know that oil was "hazardous waste" under Alaska law. Although oil is a hazardous substance for purposes of AS 46.03.822(a)(2),[26] two other Alaska statutes dealing with hazardous substances exclude oil from the definition of "hazardous substance." [27] Dorchester accurately responded that "two out of three" times Alaska law did not identify oil as a hazardous substance. Though acknowledging that the strict-liability law under which Exxon was liable, AS 46.03.822–.826, does identify oil as a hazardous substance, Dorchester indicated that in valuing the lost use of the Corporations' properties he had been more concerned with the market's perception of the hazards and toxicity of oil than with "arcane law."

In response to this testimony, the Corporations requested a jury instruction establishing that the oil spilled by the EXXON VALDEZ was a hazardous substance as a matter of law and that Exxon was strictly liable for the damages caused by the oil spill. The trial court rejected this request, reasoning that there was no need to mention "hazardous substance" because liability under the strict-liability statute was uncontested. Instead, the court simply instructed the jury that Exxon was strictly liable for damages caused by the oil spill.

Dorchester did not speak to Exxon's liability; he testified about damages. Moreover, he accurately characterized Alaska law and expressly acknowledged that the law under which Exxon conceded liability defines oil as a hazardous substance. Finally, in emphasizing that his primary concern was the market's perception of the oil spill's impact, and not "arcane law," he essentially asserted that none of the existing legal definitions of hazardous substances had any bearing on his opinions. Under these circumstances, we hold that the lower court did not abuse its discretion in refusing to instruct that oil is a "hazardous substance."

4. *The jury instructions on the Oil Pollution Act of 1990 were erroneous.*

The Corporations claim that the trial court erred by failing to instruct the jury that OPA 90[28] gave the Corporations the right to claim

---

24. *See* Alaska R. Civ. P. 51(b).

25. AS 46.03.822(a)(2) provides:
(a) Notwithstanding any other provision or rule of law . . . the following persons are strictly liable, jointly and severally, for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village, and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service, that are incurred by the state, a municipality, or a village, and the costs of projects or activities that are delayed or lost because of the efforts of the state, the municipality, or the village, resulting from an unpermitted release of a hazardous substance or, with respect to response costs, the substantial threat of an unpermitted release of a hazardous substance:

(2) the owner and the operator of a vessel or facility, from which there is a release, or a threatened release that causes the incurrence of response costs, of a hazardous substance. . . .
Under AS 46.03.826(5)(B) "hazardous substance," as used in AS 46.03.822(a)(2), is defined to include "oil." The statute further defines "oil" as "a derivative of a liquid hydrocarbon and includes crude oil, lubricating oil, sludge, oil refuse or another petroleum-related product or by-product." AS 46.03.826(7).

26. *See* AS 46.03.826(5)(B) & (7).

27. *See* AS 46.08.900(6); AS 46.09.900(4).

28. *See* 43 U.S.C. § 1642 (Supp.1998).

lost-use damages as to certain federal lands. Exxon responds that the superior court's·instructions "were consistent with applicable law and with the measure of damages instructions stipulated to by the Native Corporations."

### a. *Background*

The Corporations held patents for most of the oil-affected lands as to which they claimed damages, but their claims also encompassed some lands owned by the federal government. ANCSA had authorized the Corporations to select certain federal lands for ownership.[29] The selection process is quite cumbersome: about 90,000 acres of land selected by the Corporations remained in federal hands at the time of trial. The Corporations sought compensation from Exxon for injuries to these selected but not yet conveyed lands, contending that their claims were authorized under section 8301 of OPA 90, which provides:

> Solely for the purpose of bringing claims that arise from the discharge of oil, the Congress confirms that all right, title, and interest of the United States in and to the lands validly selected pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.) by Alaska Native corporations are deemed to have vested in the respective corporations as of March 23, 1989. This section shall take effect with respect to each Alaska Native corporation only upon its irrevocable election to accept an interim conveyance of such land and notice of such election has been formally transmitted to the Secretary of the Interior.[30]

Based on this provision, the Corporations proposed jury instructions stating that they held equitable title to the selected but not yet conveyed federal lands and were entitled to recover damages for all lost uses of these lands resulting from the spill.

Exxon countered that OPA 90 gave the Corporations no right to claim compensation for the federal government's lost uses of

these lands, but only gave them standing to claim damages for their own lost uses. Thus, according to Exxon, to recover lost-use damages as to any of the selected but unconveyed lands, the Corporations had to prove, first, that the federal government had given them authority to use the lands and, second, that the oil spill had interfered with the authorized use. Because the Corporations had conceded that they lacked any more authority to use the selected land before its actual conveyance than the general public would have, Exxon insisted that they had suffered no compensable lost use.

The court agreed with Exxon that damages could be awarded to the Corporations only for· those selected lands they could use. Accordingly, it instructed the jury that "[f]or lands that were selected but not conveyed, plaintiffs may bring a claim for damages in this action, but they must establish that they could have used such lands and that they lost some of those uses." The court went on to explain in another jury instruction that the law "allows the Native corporations to bring claims for selected but not conveyed lands, but it does not mean that the corporations or their shareholders could use such lands at the time of the spill or afterward except with the consent or approval of the federal government."

The court apparently based these instructions on the portion of OPA 90's section 8301 stating that title to the selected but not conveyed ANCSA lands was "deemed to have vested" in the Corporations "[s]olely for the purpose of bringing claims that arise from the discharge of oil...." In interpreting this language, the court relied on the September 1991 consent decree, which recognized that the Corporations retained "private claims ... for all private harms resulting from injuries caused by the Oil Spill, to lands ... deemed to have vested in the respective Alaska Native Corporation in accordance with the provisions of Sec[tion] 8301 of the Oil Pollution Act of 1990." [31]

---

29. 43 U.S.C. § 1611 (1986).

30. 43 U.S.C. § 1642 (Supp.1998) (*see supra* note 3).

31. *See supra* note 4.

b. *The jury instructions dealing with the selected but unconveyed lands incorrectly interpreted OPA 90 and improperly required the Corporations to establish their own loss of a federally permitted use.*

(i) *OPA 90 did not merely grant standing to the Corporations to litigate damages to selected but not yet conveyed lands.*

The Corporations argue that the trial court erroneously interpreted OPA 90 as merely conferring standing. They insist that OPA 90 properly should be interpreted as an assignment of a portion of the federal government's proprietary rights in lands irrevocably selected but not yet conveyed to the Corporations.[32] Under this assignment, the Corporations contend that they may recover for the federal government's spill-related lost uses of these selected but unconveyed lands.

Exxon responds that the opening phrase of OPA 90 section 8301's first sentence—"[s]olely for the purpose of bringing claims that arise from the discharge of oil"[33]—simply confers standing. We disagree. If Congress had merely intended to confer standing, it could have done so more clearly and directly with the kind of language it employs in many other statutes, where Congress provides that parties "may bring a civil action," "may sue," or "may commence a civil suit" under certain conditions.[34] Instead, Congress chose in OPA 90 to "confirm[ ] that all right, title, and interest *of the United States* ... are deemed to have vested" in the Corporations.[35] Although this language undeniably applies "[s]olely for the purpose of bringing claims that arise from the discharge of oil,"[36] it is not the language of standing. That Congress did not use one of its usual formulas for conferring standing suggests that it had some other purpose; the language it chose is more consistent with the conveyance of an interest in land or an assignment of a right beyond mere standing.[37]

In the superior court, Exxon relied heavily on *Cape Fox Corporation v. United States*[38]

---

**32.** *See Camfield v. United States,* 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260 (1897) (explaining that the United States government has, with respect to its own lands, rights of an "ordinary proprietor"); *Black's Law Dictionary* 1219 (6th ed.1990) (defining "proprietary rights" as "[t]hose rights which an owner of property has by virtue of his ownership. A right customarily associated with ownership, title, and possession ...").

**33.** 43 U.S.C. § 1642 (Supp.1998) (full text quoted *supra* p. 782).

**34.** *See, e.g.,* 7 U.S.C. § 2305(c) (1988) (Agricultural Fair Practices Act) ("[a]ny person injured in his business or property by reason of any violation of [section 2303] may sue therefor in the appropriate district court ... without respect to the amount in controversy"); 15 U.S.C. § 72 (1997) (Federal Trade Commission antidumping statute) ("[a]ny person injured in his business or property [by violation of this section] may sue therefor in the district court"); 15 U.S.C. § 298(b) (1997) (Jewelers' Liability Act) ("[a]ny competitor, customer, or competitor of a customer of any person in violation [of various sections under this statute] shall be entitled to injunctive relief ... and may sue therefor in any district court"); 15 U.S.C. § 797(b)(5) (1997) (Energy Supply and Environmental Coordination Act) ("[a]ny person suffering legal wrong [because this section was violated] may bring a civil action for appropriate relief"); 16 U.S.C. § 1540(g) (1985) (Endangered Species Act) ("any person

may commence a civil suit on his own behalf"); 30 U.S.C. § 1270 (1986) (Surface Mining Control and Reclamation Act) ("any person having an interest which is or may be adversely affected may commence a civil action on his own behalf"); 33 U.S.C. § 1365(a) (1986) (Clean Water Act) ("any citizen may commence a civil action on his own behalf"); 42 U.S.C. § 9124(a) (1995) (Ocean Thermal Energy Conversion Act) ("any person having a valid legal interest which is or may be adversely affected may commence a civil action for equitable relief on his own behalf"). *But see generally Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (recognizing that although Congress may not change the constitutional limit on standing—which requires "injury in fact" that is "fairly traceable" to the actions of the defendant and that may be redressed by the remedy sought—it may modify or abrogate judicially created prudential limits).

**35.** 43 U.S.C. § 1642 (Supp.1998) (emphasis added).

**36.** *Id.*

**37.** For example, Congress used similar language in another section of ANCSA when it clearly did intend to convey an interest· in land. It confirmed "all right, title, and interest of the United States in and to" previously tentatively approved lands selected by the State of Alaska under the Statehood Act. 43 U.S.C. § 1635(c) (1986).

**38.** 4 Cl.Ct. 223 (1983).

for the proposition that section 8301 of OPA 90 merely conferred standing. That case held in part that ANCSA corporations lack standing to assert claims against the United States for takings of lands selected but not yet conveyed.[39] Exxon argued that section 8301 was merely intended to overrule *Cape Fox*. But a careful reading of *Cape Fox* reveals otherwise.

In *Cape Fox*, the Cape Fox Village Corporation challenged the Forest Service's management of certain selected but not yet conveyed lands.[40] Among the claims Cape Fox asserted was a takings claim.[41] The United States Court of Claims held that the village corporation could not raise a takings claim because its interest in the subject lands was "contingent" and "speculative" in that "[m]ost of the lands selected by the regional and village corporations never will be conveyed," and "any interest that vests on conveyance ... is required to be subject to all valid existing rights, including contracts and leases."[42] Thus, implicitly, the court held that an injury in fact is a prerequisite for a valid claim.[43]

Given the underlying rationale of *Cape Fox*, it seems unlikely that Congress would have attempted to circumvent the case's holding by enacting a mere standing provision. Under the reasoning in *Cape Fox*, if the Corporations were merely given nominal standing to pursue lost-use damages as to the unconveyed federal lands, they would still lack any actual interest in the lands that would enable them to prove an injury in fact. In other words, had Congress conferred mere standing, without an accompanying interest, it would not have altered the reality that the Corporations' interest in the selected but unconveyed lands was too speculative to sustain a finding of actionable injury.

As evidenced by the statutes we noted above,[44] Congress does frequently confer standing without conferring a substantive interest. But those statutes are distinguishable from OPA 90; each confers standing to parties who have already sustained injuries in fact.[45] In contrast, if section 8301 were construed as a mere standing statute, it would purport to vest the Corporations with a right to sue for injuries not actually sustained. This grant of standing would be ineffectual under the rationale espoused in *Cape Fox*. Hence, if Congress intended section 8301 to allow the Corporations to recover damages despite *Cape Fox*, it would not have attained its purpose by enacting a standing provision.

Moreover, if Congress intended section 8301 only to overrule *Cape Fox* with respect to standing, its action would be constitutionally suspect under the reasoning of *Lujan v. Defenders of Wildlife*.[46] In *Lujan*, the United States Supreme Court considered whether Congress could create a purely procedural injury—one not based on an injury in fact—that would support standing.[47] Defenders of Wildlife had alleged that the citizen-suit provisions of the Endangered Species Act created such a procedural right.[48] That provision authorized anyone to sue to force a violating governmental body to comply with the Endangered Species Act. According to Defenders of Wildlife, the provision created a procedural right to governmental compliance; failure to comply was a "procedural injury" that would support standing.[49]

---

39. *See id.* at 236.

40. *See id.* at 235–36.

41. *See id.* at 236.

42. *Id.; accord Seldovia Native Ass'n, Inc. v. United States*, 35 Fed. Cl. 761, 774 (1996), *reconsidered in part*, 36 Fed. Cl. 593, 599 (1996) (holding cited for unchanged).

43. *See Cape Fox*, 4 Cl.Ct. at 236.

44. *See supra* note 34.

45. *See id.*

46. 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

47. *See id.* at 571–78, 112 S.Ct. 2130.

48. *See id.* at 571–72, 112 S.Ct. 2130.

49. *Id.*

The Supreme Court rejected this argument.[50] It reasoned that a concrete injury in fact was essential under Article III's case or controversy limits on standing.[51] Congress cannot ignore Article III's limits, the Court held, by creating "procedural injuries" that are "abstract," "self contained," and otherwise independent of any injury in fact.[52] According to the Court, Congress can create legally cognizable rights out of de facto injuries; but it cannot create de jure injuries in the absence of de facto injuries.[53]

If the Corporations lack a legally cognizable interest in selected but not yet conveyed lands under *Cape Fox*, and thus lack a concrete injury in fact, and if section 8301 of OPA 90 does not vest them with substantive rights with respect to these lands, the statute would create the sort of impermissible "abstract" procedural injury that *Lujan* condemned.

 Validly enacted statutes come to this court with a presumption of constitutionality.[54] Where it is reasonable to do so, we will construe a statute to avoid constitutional problems.[55] Because it would be unreasonable for Congress to adopt a statute that is without effect, we reject Exxon's proposed reading of section 8301, and we decline to hold that the provision merely confers standing.

(ii) *OPA 90 authorized the Corporations to assert the federal government's private claims for lost use of the selected but unconveyed lands.*

Exxon nevertheless suggests that if OPA 90 does more than confer standing, it should be read only to authorize the Corporations to pursue claims for permanent, not temporary, injuries to the selected but not conveyed federal lands. Under this theory, the statute creates a kind of legal fiction. It would require the courts to treat the selected lands as having been conveyed to the Corporations but, at the same time, would provide that the federal government would retain stewardship over the land and all right to use the land pending the actual conveyance. This would mean that the Corporations could not claim damages for the loss of temporary use because they had no actual right to use these lands pending the conveyance. That the Corporations abandoned their efforts to recover any permanent damages as to these lands at trial does not, according to Exxon, suggest a flaw in its proposed interpretation of section 8301; rather, it merely reflects a failure of proof grounded on the fact that the spill ended up causing no permanent damages to the selected lands.

But Exxon's alternative theory assumes that the Corporations' permanent interests in the selected but not yet conveyed federal lands are somehow less speculative than their temporary interests. Unless we assume that recovery for permanent injury of the selected lands would be permissible because, despite their present unconveyed status, their eventual conveyance can be predicted with enough certainty to support a finding of eventual injury in fact to the Corporations, Exxon's alternative theory would necessarily suffer from the same flaw as its theory that section 8301 is merely a standing provision. To accept the theory, we would have to conclude that Congress meant to confer upon the Corporations the right to sue for an "abstract" injury, in the absence of any injury in fact.

In our view, Exxon's assumption of greater certainty does not withstand scrutiny. Under ANCSA, Alaska Native corporations were allowed to purposefully "over-select" lands for conveyance to assure that they would eventually receive their full entitlement. In making their original selections, ANCSA corporations collectively overselect-

---

50. *See id.* at 571–78, 112 S.Ct. 2130.

51. *See id.* at 573–78, 112 S.Ct. 2130.

52. *Id.* at 573, 112 S.Ct. 2130.

53. *See id.* at 578, 112 S.Ct. 2130.

54. *See Bonjour v. Bonjour,* 592 P.2d 1233, 1237 (Alaska 1979).

55. *See id.; Larson v. State,* 564 P.2d 365, 372 (Alaska 1977); *Hoffman v. State,* 404 P.2d 644, 646 (Alaska 1965); *Reutter v. State,* 886 P.2d 1298, 1306 (Alaska App.1994).

ed about 122,600,000 acres.[56] As Exxon acknowledged below, most of these lands would never be conveyed.[57]

Although OPA 90, as implemented by the BLM, greatly reduces the uncertainty regarding future conveyances by requiring that Native corporations prune overselections to five percent when making "irrevocable" [58] selections, there is no way to know exactly which selected lands ultimately will be conveyed to the Corporations. Thus, as to any given parcel of selected but unconveyed federal land, it would be as difficult for the Corporations to prove with certainty "their own" permanent injury in fact as it would be for them to prove "their own" non-permanent injury based on future lost uses.

Moreover, Exxon's proposal to read section 8301 of OPA 90 as confirming the eventual conveyance of the selected federal lands and allowing the Corporations to recover permanent damages to these lands conflicts with the literal meaning of the statute. Section 8301 expressly uses selection, not conveyance, as the fulcrum for recovery, vesting the Corporations with "all right, title, and interest" in lands "validly *selected*." [59] The wording of the statute does not restrict itself to those lands that will ultimately be conveyed. And the Corporations did in fact seek damages for injury to lands that they selected, including thousands of acres in excess of their ANCSA entitlement.

These excess lands, we believe, hold the key to understanding the intended effect of OPA 90. Because section 8301 conveys rights to the overselected lands that will never be held by the Corporations as well as to the selected lands that will, it seems fair to infer that in enacting the provision, Congress intended to convey an actionable right, rather than a fictitious future interest in the selected federal land.

The Corporations propose an interpretation of section 8301 consonant with this inference. They maintain that, with respect to all of the selected but unconveyed lands, OPA 90 simply assigns all of the federal government's oil-spill claims to the Native corporations.

■ It is well established that a cause of action or claim for damages with respect to trespass or subsequent injury may be assigned without transfer of title to the underlying property.[60] Section 8301 can plausibly be read as such an assignment: Congress used the language of conveyance—"right, title, and interest"—but by using the words "[s]olely for the purpose of bringing claims that arise from the discharge of oil," [61] limited the conveyed interest to a cause of action, rather than to any land right. This reading is textually straightforward and would give effect to Congress's intent that Alaska Native corporations be able to bring claims.

Before OPA 90 was enacted, the interests of ANCSA corporations in the subject lands was too speculative to serve as a basis for proof of injury or to otherwise support standing.[62] Congress sought to eliminate the uncertainty by adopting section 8301. Read in the manner that the Corporations propose, the statute would avoid the uncertainty by allowing ANCSA corporations to pursue all spill-related proprietary claims that the federal government could have pursued in its own right with respect to the selected but unconveyed lands, regardless of whether those lands ever will be conveyed.

(iii) *The Lujan Decree does not foreclose the Corporations' land-use claims.*

■ While the Corporations' proposed interpretation of section 8301 has much to recommend it, we must consider whether it conflicts with the "Lujan Decree"—the consent decree signed by the Native Corpora-

**56.** *See Cape Fox Corporation v. United States,* 4 Cl.Ct. 223, 234 (1983).

**57.** *Id.* at 236.

**58.** 43 U.S.C. § 1642 (Supp.1998).

**59.** *Id.* (emphasis added).

**60.** *See United Verde Copper Co. v. Jordan,* 14 F.2d 299, 301 (9th Cir.1926); *Andersen v. Edwards,* 625 P.2d 282, 290 (Alaska 1981).

**61.** 43 U.S.C. § 1642 (Supp.1998).

**62.** *See Cape Fox,* 4 Cl.Ct. at 236, and discussion *supra* pp. ——–——.

tions and the United States in September 1991 in *Native Village of Chenega Bay et al. v. State of Alaska and United States.*[63] The Lujan Decree provides, in relevant part:

> [Native corporations shall have the right] to the exclusion of the Governments, to pursue private claims, other than claims for Natural Resource Damages, for all private harms resulting from injuries caused by the Oil Spill, to lands either, (a) legally owned by it; or (b) deemed to have vested in the respective Alaska Native Corporation in accordance with the provisions of [OPA 90].[64]

The superior court accepted Exxon's "standing" theory of section 8301 in part because of the "private claims" language included in the Lujan Decree. The court agreed with Exxon that the "private claims" mentioned in the decree must have referred to the "private" harms suffered by the Corporations themselves and did not include harms to the federal government's "public" land.

But when we consider the "private claims" language in the context of the litigation that led up to the Lujan Decree, another meaning emerges. The Lujan Decree was the culmination of efforts by various ANCSA corporations that sought to preserve their rights to claim oil-spill damages by intervening in the federal court settlement between Exxon and the governments of the United States and Alaska. The state and federal governments were settling claims with Exxon for "natural resource damages" recoverable by the governments under various federal laws, including 33 U.S.C. § 1321(f)(5), a provision of the Clean Water Act (CWA).

■ This CWA provision authorized the federal and state governments to recover "on behalf of the public as trustees" for the cost of restoration, rehabilitation, and replacement of damaged or destroyed natural resources.[65] Although the CWA did not authorize Native corporations or villages to sue in the same "public" capacity,[66] affected villages managed to intervene as private parties in the federal action in part by asserting a claim for damages under a different federal statute.[67] And various affected ANCSA corporations intervened seeking damages under ANCSA itself.[68] Hence, the Lujan Decree's reference to "private claims" merely recognizes that the federal and state governments had sued as public trustees asserting "public" claims and that their settlement with Exxon did not encompass the non-CWA claims that the intervening villages and corporations sought to assert as private parties.

So construed, the Lujan Decree does no more than preserve the status quo with respect to the Corporations' private claims: its "private claims" language maintains neutrality as to who might pursue the kind of proprietary, or "private," federal claims assigned to the Corporations under section 8301.[69]

Because the consent decree's "private claims" language does not militate against interpreting section 8301 as more than a statute conferring standing, we adopt the Corporations' proposed reading of the provision. We thus conclude that it was error to treat the statute as a "standing" provision in the jury instructions.

### c. *The OPA 90 jury instructions were prejudicial.*

■ An erroneous statement of law in a jury instruction warrants reversal if it prejudices a party,[70] substantially influencing the

---

**63.** No. A91–454 Civ. (D.Alaska Sept. 24, 1991).

**64.** *See supra* note 4.

**65.** 33 U.S.C. § 1321(f)(5) (1982).

**66.** The CWA does not recognize Native corporations or villages as public trustees. *See id.*

**67.** The villages asserted their claim under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq. *See* Darrin Quam, *Right to Subsist: The Alaska Natives' Campaign to Recover Damages Caused by the Exxon Valdez Spill,* 5 Geo. Int'l Envtl. L.Rev. 177, 182–83 (1992).

**68.** *See* Quam, *supra* note 67, at 182–83.

**69.** OPA 90 was enacted on August 18, 1990, and retroactively assigned rights as of March 23, 1989. The Lujan Decree was entered into on September 24, 1991.

**70.** *See Sever v. Alaska Pulp Corp.,* 931 P.2d 354, 361 n. 11 (Alaska 1996).

outcome of the case.[71]

■ In the present case, two jury instructions reflected the incorrect view that section 8301 gave the Corporations standing to sue only for "their own" lost-use damages on the selected but unconveyed federal lands. Jury Instruction No. 25 stated:

> For lands that were selected but not conveyed, plaintiffs may bring a claim for damages in this action, but they must establish that they could have used such lands and that they lost some of those uses.

Jury Instruction 26 built on this view of the Corporations' claims, stating that the "Native corporations do not have a right to use lands that have been selected but not conveyed without the consent or approval of the federal government" and narrowly describing their rights under section 8301 as follows:

> In 1990, after the Oil Spill, the Alaska Native Claims Settlement Act was amended to provide that Native corporations could elect to accept interim conveyance of selected but not yet conveyed lands by filing a notice called an irrevocable election. The law provides that, upon filing a notice of irrevocable election, "all right, title and interest in and to the lands" are deemed to have vested in the respective Native corporations as of March 23, 1989. This requirement has been met as I have previously advised you. This law allows the Native corporations to bring claims for selected but not conveyed lands, but it does not mean that the corporations or their shareholders could use such lands at the time of the spill or afterward except with the consent or approval of the federal government.
>
> In determining what damages, if any, were suffered by the plaintiff Native corporations for selected but not conveyed lands, you must consider: (1) whether the Native corporations were permitted to use the selected but not conveyed lands for which they are asserting claims; and (2) whether the corporations suffered any loss or interruption of uses for such lands.

The jury received these instructions against an evidentiary backdrop of testimony from several corporate and former corporate officers who conceded that the federal government had not permitted any specific uses of the selected public lands and that until the lands were actually conveyed the Corporations could engage only in those recreational uses permitted the general public. By precluding any award to the Corporations based on the government's proprietary uses and by allowing an award only for the Corporations' own loss of federally permitted uses, the jury instructions virtually foreclosed any damage award for the selected but unconveyed lands.

Had the Corporations been allowed to claim damages for the federal government's lost proprietary uses, as contemplated by section 8301, the result may well have been different. For the Corporations presented relevant evidence at trial tending to prove that the spill had interfered with the federal government's preservation and other proprietary uses on the selected lands. And since the jury found that similar evidence with respect to the Corporations' own lands warranted awarding substantial lost-use damages, we conclude that the section 8301 instructional error was prejudicial.

5. *Archeology instruction: the superior court did not err in refusing to instruct the jury regarding the Corporations' alleged property interest in archeological resources found on state land.*

The Corporations' expert archeologist, Dr. Lora Johnson, testified that various archeological sites for which the Corporations claimed damages lie both above and below the mean high tide line. On cross-examination, Dr. Johnson granted that the Corporations did not own any of the land below the mean high tide line and thus that any artifacts found there belong to the state. Following Exxon's cross-examination, the Corporations requested that the court take

---

71. *See Martinez v. Bullock,* 535 P.2d 1200, 1206 (Alaska 1975); *Hazen v. Municipality of Anchor-* *age,* 718 P.2d 456, 462 (Alaska 1986).

judicial notice of AS 41.35.020,[72] which they contended grants them the "possession and use" of artifacts located on state lands. They asked the court to instruct the jury accordingly, but the court refused. The Corporations now argue that the court erred in failing to give their requested jury instruction and that this error precluded the jury from awarding damages for injury to their statutorily protected property rights. However, we conclude that no prejudicial error occurred.

The Corporations' theory of damage under AS 41.35.020 has been somewhat fluid. The record reveals two potential bases for the Corporations' claim that they were entitled to recover for damages to archeological resources below the mean high tide line. First is the theory that damage to the intertidal area damaged the Corporations' upland sites by impairing the historical context necessary to ensure a full understanding of the portions of the archeological sites located above the mean high tide line. Second is the theory that AS 41.35.020 gives the Corporations a property right in artifacts below the mean high tide line:

> [W]ithin the bundle of rights the Native corporations have, there is in addition to these common law ... rights, some statutory basis for an interest in archaeological sites and artifacts below mean high tide. Now it may well be that Natives would have to approach the state and get a license, but it's our view that they do have a property interest which is cognizable under the law and the court could take notice of that.

Exxon counters that AS 41.35.020 does not give the Corporations an enforceable property right to archeological resources on state-owned lands. It maintains that an award of damages to the Corporations for archeological harm below the mean high tide line would

require it to pay twice for the same injury, because it has already settled with the State of Alaska the state's claims for damages to archeological resources on state lands. We find Exxon's arguments persuasive for several reasons.

■ First, we reject the Corporations' claim to a statutorily created property right. Alaska Statute 41.35.020 expressly reserves to the state "title to all historic, prehistoric, and archeological resources situated on land owned or controlled by the state, including tideland and submerged land" and specifically "reserves to itself the exclusive right of field archeology." [73] The statute recognizes the "cultural rights and responsibilities" [74] of aboriginal persons to possess and use certain artifacts for study and display, but only in certain limited circumstances where the state's rights are protected.[75] Thus, while AS 41.35.020 recognizes limited cultural rights, the provision does not create a property right supporting a claim for damage to artifacts not in the Corporations' actual possession and control.

■ Second, we conclude that, even if AS 41.35.020 allocates certain rights to the Corporations, Exxon's settlement with the state precludes the Corporations from recovering for damages sustained below the mean high tide line. If the Corporations were allowed to recover under the statute for damages to archeological resources located below the mean high tide line, then Exxon would be unfairly forced to pay twice for the same injury, having already paid the state for those damages.[76]

Third, the superior court offered the Corporations an opportunity to cure any potential misunderstanding as to Dr. Johnson's testimony. After Dr. Johnson conceded on cross-examination that the artifacts below the mean high tide line belonged to the state, the Corporations objected to the implication

---

72. AS 41.35.020 is a provision of the Alaska Historic Preservation Act. *See* AS 41.35.010–.240.

73. AS 41.35.020(a); *see* AS 41.35.020(b).

74. AS 41.35.020(a).

75. *See* AS 41.35.020(b) (limiting aboriginal possession to those situations where the artifacts are safely preserved).

76. *See In re Air Crash Disaster Near Cerritos, California, on August 31, 1986,* 982 F.2d 1271, 1277 (9th Cir.1992) (holding that defendant should not be made to pay twice for same injury).

that they had no interest in those artifacts, requesting that Dr. Johnson be allowed to testify further as to her understanding of their interest. The court granted this request, and Dr. Johnson testified again the following day. But the Corporations failed to ask her any further questions concerning the Corporations' interest in artifacts below the mean high tide line. Having failed to avail themselves of the opportunity to cure any error that might have occurred during Dr. Johnson's cross-examination, the Corporations may not now claim that they were denied an opportunity to present their theory of statutory rights to the archeological resources below the mean high tide line.

For all of these reasons, we conclude that the trial court did not err in refusing to instruct the jury on AS 41.35.020.

B. *The Superior Court Did Not Err in Allowing a Set–Off Against the Corporations' Jury Award for the TAPL Fund.*

The jury awarded the Corporations damages of almost $6,000,000. Before the verdicts were entered, the Trans–Alaska Pipeline Liability Fund (the Fund) made settlement payments of approximately $23,000,000 to the Corporations for losses they sustained from the EXXON VALDEZ oil spill. The superior court set off the Fund settlement payment amounts against the jury award and, accordingly, entered judgments that the Corporations would take nothing from the verdict. The Corporations argue that the court erred in reducing the jury awards by the amount of the Fund settlement payments.

In general, a court will not reduce a tortfeasor's liability to a victim when the victim receives compensation from a collateral source.[77] On the other hand, payments made to the victim from non-collateral sources—such as the tortfeasor's insurance company or a joint tortfeasor—reduce the tortfeasor's liability.[78]

In adopting the collateral source rule in *Ridgeway v. North Star Terminal & Stevedoring Co.*, this court explained that

> a tort-feasor is not entitled to have his liability reduced merely because plaintiff was fortunate enough to have received compensation for his injuries or expenses from a collateral source....[79]

A collateral source is "a source [that] is entirely independent of and collateral to a wrongdoer who is legally responsible for the injuries." [80] Thus, while a victim's own insurance or a charity may be a collateral source,[81] a tortfeasor's insurance is not, since it is actually paid for by the tortfeasor.[82]

The collateral source rule thus embodies an attempt to reconcile two competing principles of tort law: [83] (1) that an injured party should recover no more than the amount needed to make the party whole [84] and (2) that the tortfeasor should be held accountable for all damages resulting from the tort.[85] An injured party who is compensated by both a collateral source and the tortfeasor for the same injury obtains a double recovery; but a tortfeasor who is credited for compensation paid to the victim from a collateral source escapes accountability. The common-law collateral source rule resolves this conflict in favor of the injured party: it

---

77. *See Alyeska Pipeline Serv. Co. v. H.C. Price Co.*, 694 P.2d 782, 787 (Alaska 1985); *King v. Jordan*, 601 P.2d 273, 278 (Alaska 1979); *Wright v. Vickaryous*, 598 P.2d 490, 501–02 (Alaska 1979); *see also* Restatement (Second) of Torts § 920A(2) & cmt. b (1977).

78. *See* Restatement (Second) of Torts § 920A(2) & cmt. b (1977).

79. 378 P.2d 647, 650 (Alaska 1963).

80. *Alyeska Pipeline Serv. Co.*, 694 P.2d at 788 (quoting James P. Moceri & John L. Messina, *The Collateral Source Rule in Personal Injury Litigation*, 7 Gonz. L.Rev. 310 (Spring 1972) (internal quotations omitted)).

81. *See King*, 601 P.2d at 278.

82. *See Wright*, 598 P.2d at 502; Restatement (Second) of Torts § 920A(2) & cmt. b (1977).

83. *See King*, 601 P.2d at 278.

84. *See Maynard v. State Farm Mut. Auto. Ins. Co.*, 902 P.2d 1328, 1333–34 (Alaska 1995); *Luth v. Rogers & Babler Const. Co.*, 507 P.2d 761, 766 (Alaska 1973).

85. *See King*, 601 P.2d at 278.

allows the victim a double recovery if the alternative would be to allow the tortfeasor to escape liability.[86]

 Alaska Statute 09.17.070 modifies this common-law rule by shifting the balance from the victim toward the tortfeasor. The statute allows the court to reduce an injured party's jury award to reflect unsubrogated collateral source payments in some circumstances.[87] By doing so, AS 09.17.070 limits the circumstances in which a victim can receive double recovery, while enhancing the chances that a tortfeasor may not be held fully accountable.

 The Corporations contend that AS 09.17.070 did not permit the superior court to subtract the Fund settlement payments from the jury awards, because the Fund settlement was a "collateral source payment" and was subrogated. Exxon responds that the Fund is not a collateral source and that, therefore, neither the collat-

eral source rule nor AS 09.17.070 bars reduction. We agree with Exxon.[88]

The Fund was created by 43 U.S.C. § 1653(c) and is underwritten by a fee of five cents per barrel assessed on all oil shipped through the Trans–Alaska Pipeline.[89] The owners of the oil pay the fee.[90] In the event of a spill, the Fund, the owner of the spilling vessel, and the vessel's operator are strictly liable for the resulting damages in varying amounts: the owner and operator are jointly and severally liable for the first $14,000,000 in damages, and the Fund is liable for the balance, up to a $100,000,000 limit.[91] In *In re Glacier Bay*, the Ninth Circuit clarified how 43 U.S.C. § 1653 operates:

> [The Act establishing the Fund] is a comprehensive liability scheme.... [The Act's] strict liability provision ensures that ... oil spill victims receive prompt compensation without resort to prolonged litigation.

---

**86.** *See id.*

**87.** Specifically, AS 09.17.070 provides:

(a) After the fact finder has rendered an award to a claimant, and after the court has awarded costs and attorney fees, a defendant may introduce evidence of amounts received or to be received by the claimant as compensation for the same injury from collateral sources that do not have a right of subrogation by law or contract.

(b) If the defendant elects to introduce evidence under (a) of this section, the claimant may introduce evidence of

(1) the amount that the actual attorney fees incurred by the claimant in obtaining the award exceed the amount of attorney fees awarded to the claimant by the court; and

(2) the amount that the claimant has paid or contributed to secure the right to an insurance benefit introduced by the defendant as evidence.

(c) If the total amount of collateral benefits introduced as evidence under (a) of this section exceeds the total amount that the claimant introduced as evidence under (b) of this section, the court shall deduct from the total award the amount by which the value of the nonsubrogated sum awarded under (a) of this section exceeds the amount of payments under (b) of this section.

(d) Notwithstanding (a) of this section, the defendant may not introduce evidence of

(1) benefits that under federal law cannot be reduced or offset;

(2) a deceased's life insurance policy; or

(3) gratuitous benefits provided to the claimant.

(e) This section does not apply to a medical malpractice action filed under AS 09.55.

**88.** Whether the superior court properly set off the Fund settlement payment against the jury award is a question of law. *See Luth,* 507 P.2d at 767 (holding that judge rather than jury should determine the amount of set-off). "We review questions of law de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy." *Bauman v. Day,* 892 P.2d 817, 824 (Alaska 1995) (citing *Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2 (Alaska 1987)). In briefing this case, the parties have assumed that *the statutory version* of the collateral source rule, set out in AS 09.17.070, applies to this case. But under either version of the collateral source rule, payments previously received from a non-collateral source could properly be deducted from a jury award. Accordingly, our conclusion that the Fund is not a collateral source makes it unnecessary to question the parties' assumption that the statutory form of the rule governs this case. *But cf.* AS 09.17.040(a) (suggesting that the statutory version of the collateral source rule set out in AS 09.17.070 may apply only in cases of personal injury).

**89.** *See* 43 U.S.C. § 1653(c)(1) & (5) (1986 & Supp.1998).

**90.** *See* 43 U.S.C. § 1653(c)(5) (1986 & Supp. 1998).

**91.** *See* 43 U.S.C. § 1653(c)(1) & (3) (1986 & Supp.1998).

... [The Act includes a] subrogation section, allowing, for example, the Fund to seek reimbursement of its strict liability contribution from the owner in the event that owner negligence caused the spill. . . .

... After an oil spill, innocent victims receive prompt compensation. Then, the parties involved with the transportation of the spilled oil and the Fund litigate fault. Ultimately, the costs of the spill are borne by the responsible party.[92]

Following the EXXON VALDEZ spill, the Fund paid the Corporations approximately $23,000,000 in settlement of their claims. Pursuant to the settlement agreement, the Corporations released the Fund from further liability and assigned to it all rights that they had against any other party for damages arising out of the spill to the extent of the Fund's initial payment. The Fund in turn sued Exxon, asserting its statutory subrogation rights under 43 U.S.C. § 1653(c)(3) and its right as assignee of the Corporations' claims.

The Corporations maintain that, unlike a tortfeasor's insurer, the Fund has no duty to defend, hold harmless, or indemnify Exxon. Thus they suggest that the Fund is independent of Exxon. Furthermore, they point out that the Fund was established by Congress "for the benefit of *oil spill victims,* not oil companies." Accordingly, the Corporations liken the Fund to *"victims'* insurance" and argue that it should be considered a collateral source. Because the Fund has reimbursement rights against Exxon, the Corporations maintain that the Fund is a subrogated collateral source and that its payments to the Corporations therefore do not qualify for a set off under the collateral source rule.

But the Corporations are mistaken in reasoning that the Fund's commitment to the

goal of aiding oil-spill victims renders it "entirely independent of"[93] Exxon or justifies likening it to an insurance policy owned by Exxon's victims. Exxon and the Fund are co-obligors: by law, they were both strictly liable for the spill; Exxon was liable for the first $14,000,000 in damages, and the Fund was liable for $86,000,000 in additional damages.[94] Moreover, the Fund's entitlement to reimbursement from Exxon did not arise from a subrogation agreement with the Corporations. Instead, it arose under federal law as a result of the federally created relationship between the Fund and Exxon.[95] This, then, is not a situation in which denying a set off is necessary to prevent the wrongdoer from escaping accountability.

To the contrary, if we were to consider the Fund a subrogated collateral source, we would not only enable the Corporations to receive a double recovery, but also leave Exxon exposed to double payment—once to the Corporations in damages and again to the Fund in reimbursement of its settlement payments to the Corporations for the same damages. The collateral source rule certainly does not dictate such a result.

Accordingly, we hold that the trial court properly subtracted the Corporations' $23,-000,000 Fund settlement from their $6,000,-000 jury verdict.[96]

C. *Exxon's Cross–Appeal*

1. *The superior court did not err in denying Exxon's motions for directed verdict and for judgment notwithstanding the verdicts on the Corporations' claims for damages to their lands.*

On cross-appeal, Exxon argues that the trial court erred in denying its motions for

---

**92.** *In re Glacier Bay,* 944 F.2d 577, 582 (9th Cir.1991).

**93.** *Alyeska Pipeline Serv. Co. v. H.C. Price Co.,* 694 P.2d 782, 787 (Alaska 1985).

**94.** *See* 43 U.S.C. § 1653(c)(1) & (3).

**95.** *See* 43 U.S.C. § 1653; *In re Glacier Bay,* 944 F.2d at 582 (explaining that under 43 U.S.C. § 1653, ultimately the costs of a spill must be borne by the responsible party and not by the Fund).

**96.** The Corporations separately challenge the propriety of the superior court's decision to set off their verdict against another settlement, which they received from Alyeska. Because our conclusion that the court properly set off the $23,000,000 Fund settlement results in the Corporations receiving no recovery from Exxon, we need not consider the issue of set off for the Alyeska settlement payments.

directed verdict and judgment not withstanding the verdicts on the Corporations' land-damages claims because the Corporations failed to present evidence that any economic use of their property was lost and because they failed to establish any reasonable measure for determining lost-use damages.

### a. *Preservation is a compensable lost use.*

■ The parties generally agree that the proper measure of damages for injuries to corporate lands is the value of the Corporations' lost use; their disagreement on damages focuses on what constitutes a lost use and how its value must be measured. The Corporations claim that they used their lands for their "pristine value" and "natural bounty" and that the spill impaired this use. Viewing the Corporations' preservation of the lands in wilderness status as a non-use, Exxon rejoins that their use is not compensable.

■ Exxon cites numerous cases to support its contention that the Corporations may only recover for lost uses of their lands that are pecuniary in nature. But, at most, these cases stand for the proposition that a land-owner may not recover lost-use damages for uses that are speculative.[97] For example, Exxon relies on *City of Los Angeles v. Ricards*.[98] But *Ricards* did not hold that a use must be pecuniary before it can be compensated. In *Ricards*, the city temporarily impaired access to property that a landowner held solely for "speculation and investment appreciation."[99] In reversing an award of damages for the impairment, the California Supreme Court simply held that the land-owner had failed to show *any* potential use that the city's actions might have impaired.[100] In contrast, here the Corporations presented evidence that they held their property for preservation, that this use of the land had value, and that Exxon's intrusion on the land temporarily impaired this value.

We are not convinced that lost-use damages should be limited to commercial uses. *Black's Law Dictionary* defines "use value" as "[t]he value established by the usefulness of an object and not its value for sale or exchange."[101] Nothing in this definition restricts use value to those values derived from economic uses. To the contrary, the definition's explicit rejection of "sale or exchange" value implicitly acknowledges that property may have cognizable uses that are not com-

---

**97.** *See Wernberg v. Matanuska Elec. Ass'n*, 494 P.2d 790, 791 (Alaska 1972) (noting that the trial court rejected as "speculative" landowner's claimed lost-use damages based on his allegedly intended use of land as an airstrip, where the landowner had taken no steps to develop that use); *Ruiz v. Varan*, 110 N.M. 478, 797 P.2d 267, 271 (1990) (affirming trial court's refusal to award damages for loss of use of development property where partnership held property for no specific use and presented no evidence of actual lost uses); *Eisen v. Westchester*, 69 A.D.2d 895, 415 N.Y.S.2d 888, 888–89 (N.Y.App.Div.1979) (holding that the "measure of damages in a trespass action is the diminution in the rental or usable value of the premises caused by the trespass, taking the property as is and as zoned"); *Rumsey v. New York & New England R.R. Co.*, 133 N.Y. 79, 30 N.E. 654, 654–55 (1892) (instructing that the proper measure of damages is the diminished rental or useable value of the property as it was at the time of injury and, thus, not as a brickyard, given that the property had not been used as a brickyard for six years); *Tallman v. Metropolitan Elevated Ry. Co.*, 121 N.Y. 119, 23 N.E. 1134, 1134 (1890) (holding that the "plaintiff's recovery must be confined to the diminished rental or usable value of the lots

as they were"); *Clark v. Pennsylvania R.R. Co.*, 145 Pa. 438, 22 A. 989, 991 (1891) (holding that the estimate of damages sustained in the use of land must be based on "the purposes to which for the time the land was used, or for which it would have been used" and, therefore, that the landowner could not recover for use of land as a mill site where there was as yet no mill). *Cf. United States v. Michoud Indus. Facilities*, 322 F.2d 698, 703 (5th Cir.1963) (instructing in a condemnation proceeding that "just compensation is the fair market value of the property at the time of the taking" in light of "the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future").

**98.** 10 Cal.3d 385, 110 Cal.Rptr. 489, 515 P.2d 585 (1973).

**99.** *Id.* 110 Cal.Rptr. 489, 515 P.2d at 586 (internal quotations omitted).

**100.** *See id.* 110 Cal.Rptr. 489, 515 P.2d at 586–89.

**101.** *Black's Law Dictionary* 1392 (5th ed.1979).

mercial.[102]

The Corporations assert that by preserving large tracts of their lands they enable their shareholders to practice and maintain their cultures and their tradition of subsistence hunting and fishing. As Congress recognized in enacting the Alaska National Interest Lands Conservation Act (ANILCA), "the continuation of the opportunity for subsistence uses ... by Alaska Natives on Native lands is essential to Native physical, economic, traditional, and cultural existence...." [103] By impairing the lands' preservation use, Exxon injured the Corporations' right and duty to hold the lands in their natural state for the benefit of shareholders.

Moreover, in an era marked by worldwide population explosion, an emerging global economy, and industrial development reaching into virtually every corner of the earth, it hardly seems unrealistic to recognize the value of preserving wilderness as a valid use in itself, quite apart from any incidental benefit conservation might have in promoting subsistence living and cultural survival. For example, in *United States v. 117,763.00 Acres of Land in Imperial County, California,* a federal court recognized that "[t]he fact that there is no proof of a market for a particular kind of property does not permit [the defendant] to take useful property for nothing...." [104] We, too, conclude that lost-use damages may be awarded for the tortious impairment of non-economic uses such as preservation.[105]

### b. *Reasonable basis for measuring lost preservation-use damages*

 This conclusion leads us to inquire whether the evidence in this case sufficed to prove lost preservation-use damages. "[O]n review of motions for directed verdict or for judgment notwithstanding the verdict, [our role] is not to weigh conflicting evidence or judge the credibility of witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable [jurors] could not differ in their judgment." [106]

As we mentioned in describing Exxon's damages argument, the Corporations' experts calculated their lost-use estimates by comparing hypothetical income streams for the Corporations' lands, impaired and unimpaired. They derived the income streams by taking as a fair rental value a percentage of the lands' fair market value. Exxon challenges the Corporations' application of this methodology, contending that owners of vacant and unused land are entitled only to what a renter might actually pay to use the land in a real-world market and "not some hypothetical, pipedream rental rate." [107] Exxon argues that the Corporations' methodology "bore no relation to what an actual renter would have paid to lease the property." Thus, according to Exxon, the Corporations failed to provide the jury with a reasonable, market-based estimate of fair rent.

But Exxon overlooks the point that the Corporations are not seeking damages for

---

**102.** *Cf. United States v. 117,763.00 Acres of Land in Imperial County, California,* 410 F.Supp. 628, 631 (S.D.Cal.1976), *aff'd sub nom. United States v. Shewfelt Inv. Co.,* 570 F.2d 290 (9th Cir.1977) (rejecting owner's valuation of condemned land where owner's sole use of the land was for speculation).

**103.** 16 U.S.C. § 3111(1).

**104.** *117,763.00 Acres,* 410 F.Supp. at 631.

**105.** Exxon briefly advances a maritime preemption argument, contending that "to the extent Alaska law would permit loss of use damages in the absence of evidence of a viable use appellants would have made of their property, federal maritime law does not." But Exxon's preemption argument incorrectly assumes that preservation is not a "viable use." The cases Exxon cites to support this argument simply hold, as *Ricards*

did, that a plaintiff must establish loss of a viable use in order to recover lost-use damages. *See, e.g., Dow Chemical Co. v. M/V ROBERTA TABOR,* 815 F.2d 1037, 1042 (5th Cir.1987); *J/O Ebony K/S v. DREDGE STUYVESANT,* 804 F.Supp. 898, 900–02 (S.D.Tex.1992). We do not read these cases to hold or suggest that preservation of wilderness lands cannot, in appropriate circumstances, be deemed a "viable use."

**106.** *Hahn v. Russ,* 611 P.2d 66, 67 (Alaska 1980) (quoting *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 220 (Alaska 1978)).

**107.** For this proposition, Exxon cites *117,763.00 Acres,* 410 F.Supp. 628, and *United States v. Michoud Indus. Facilities,* 322 F.2d 698 (5th Cir.1963).

lost use of unused lands. They are seeking damages because the oil spill impaired their ability to preserve the land as it was.

In *117,763.00 Acres*, one of the cases Exxon cites to support its claim of insufficient lost-use evidence, the court rejected the defendant's valuation method, which was based on a percentage of the purported market value of the land.[108] But, in doing so, the court recognized that "where property ... has a substantial use value but is not commonly traded," owners may prove lost-use damages by nonstandard methods.[109] Specifically, the court observed that in such cases compensation for lost use may be calculated based on a percentage of the land's market value.[110] The court ruled the percentage-of-market-value method inappropriate in the case before it only because it found that the desert land for which damages were being sought "ha[d] no proved use except as a gunnery range" and that that was not a "substantial use."[111]

▇▇▇▇ In our view *117,763.00 Acres* supports the proposition that when wilderness lands are shown to have substantial use value in their natural state, impairment of that use is compensable, and the value of the lost use may be proved by expert testimony express-

ing damages as a percentage of the land's market value. We thus conclude that the Corporations' calculation of lost rental value based on a percentage of the underlying market value of the property was an appropriate method for determining damages.[112] This method "provide[d] the jury with a 'reasonable basis' for computing the award." [113] The evidence in the record, when viewed in the light most favorable to the Corporations, "is such that reasonable persons could differ in their judgment as to" the fact, and amount, of damages.[114]

The Corporations' experts described preservation as a desirable, valuable use of corporate lands; they testified that preservation required intact ecological systems with biological diversity. Other witnesses testified that the oil persisted on the land for a period of time, as did cleanup crews. The Corporations also presented expert testimony that these invasions impaired the value of the lands and their use. Dr. Hayden Green, the Corporations' expert who calculated the impaired value for the first three years following the spill, specifically depicted how these intrusions affected the preservation use of the land.[115]

Indeed, Exxon's own expert, Dorchester, relied on similar methodology to calculate

---

108. *See 117,763.00 Acres*, 410 F.Supp. at 631.

109. *Id.*

110. *See id.; accord In re Condemnation of Lands for Military Camp*, 250 F. 314, 315 (E.D.Ark. 1918) (holding that owners of condemned property that "is wild ... and not subject to cultivation" could recover damages measured by the "prevailing rate of interest on [the property's] fair value").

111. *117,763.00 Acres*, 410 F.Supp. at 631.

112. Exxon also relies on *Michoud* to support its claim of insufficient evidence. But *Michoud* is in accord with, and therefore does not change, our analysis. *See* 322 F.2d at 707–08.

113. *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 154 (Alaska 1992) (quoting *Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 222–24 (Alaska 1978)).

114. *See Hahn v. Russ*, 611 P.2d 66, 67 (Alaska 1980).

115. Dr. Green testified, in relevant part:

A: There was actual physical oil out there. There is a disruption to the ecological system, which we were able to determine. By that—and we're talking about environmental land that is important ecological environment, if you would, and that environment was disrupted because there was [sic] thousands of animals and birds and things that were dying and affected and, in some cases, the food chain is affected.

....

Q: Did you arrive at an opinion as to the harm to the property if any?

A: ... It's my opinion that in the early stages of ... the [oil] spill, ... a portion of the property rights that [Native Corporations] typically enjoyed were suspended....

I've seen photographs of beach workers with oil up to their shoulders working on those beaches. You had boats brought—many boats brought into the area. You had helicopters flying all over the place. You had barges with huge hoses spraying down the beaches. It's difficult to think that you would have what we would call quiet enjoyment of your—of the use of your land during that period of time.

lost-use value for some of the affected parcels; this evidence in itself might suffice to permit a reasonable person to conclude that the spill had caused compensable lost-use damages.[116]

Viewing the evidence in the light most favorable to the non-moving party,[117] we conclude that the trial court correctly left this issue to the jury. We therefore affirm the trial court's denial of Exxon's motions for directed verdict and judgment notwithstanding the verdicts regarding land damages.

2. *The superior court did not err in denying Exxon's motion for a directed verdict or for judgment notwithstanding the verdicts on the Corporations' archeological resources claims.*

a. *Background*

In its cross-appeal, Exxon asserts that the trial court erred in refusing to grant its motion for a directed verdict or for a judgment notwithstanding the verdicts on the Corporations' archeological resources claims. Exxon asserts that the Corporations presented no evidence of actual physical harm to their archeological sites from the oil spill. Exxon also argues that the Corporations' lost-confidentiality theory of damages is legally untenable.

The Corporations respond that they did present evidence of actual physical damage as a result of the spill and cleanup. They further argue that they presented evidence of foreseeable future harm to their archeological sites as a result of the loss of the sites' confidentiality.

In support of their archeological damages claims, the Corporations presented the testimony of two archeologists, Dr. Lora Johnson and Dr. Jack Lobdell. They described two basic types of damage to the sites: (1) loss of confidentiality and (2) "impacts." According to Dr. Johnson, the Corporations traditionally leave archeologically significant sites alone. Dr. Johnson stated that the Corporations' philosophy was that "you don't want to collect things, you don't want to change things, you want to basically keep it intact as much as possible." According to Drs. Johnson and Lobdell, the Corporations kept the location of these sites confidential out of fear that the sites would be changed—either by people visiting and inadvertently changing the sites or by vandals and looters deliberately damaging the sites. These experts also testified that the confidentiality of the sites was lost when Exxon moved oil workers into the area to clean up the spill. They feared that the workers, having learned the locations of various sites, would return to damage or loot them.

The other element of the Corporations' archeological damages claims flowed from "impacts" to the sites. According to the Corporations' experts, anything that moved an artifact was potentially problematic because the artifact's "archeological context" is important in reconstructing the history of a site. These kinds of impacts included: cleanup workers walking over intertidal and uplands sites; artifacts being washed into the water with hoses during the cleanup effort; destruction of sites by vandalism; and inadvertent pickup and disposal of artifacts by

---

**116.** After specifying that his research revealed extensive oiling of a particular parcel, Dorchester, referring to a chart, explained as follows his calculation of the value of the damage:
 A: Down here what we have is our calculation of the impairment for this property. Behind the sheet up here is information about our acreage values, the numbers of acres, consideration of the total parcel and then the shoreline-related area, and ultimately here, we concluded that these shoreline[-]related areas had a market value of $650,000 for shoreline-related area.
 . . . .
 A: . . . Then what we did . . . to calculate our impairment, we started with the value of the shoreline-related area. . . .

In the first year, our analysis was that the shoreline-related area was effectively 100 percent impaired. . . .

The calculation that we did, then, was to multiply six percent times $650,000, and this indicated that a just and reasonable compensation for the impairment of that land for the first year of the oil spill would have been $39,000.

 . . . .

 A: Six percent is the market rate that we used as a license rental rate for purposes of estimating just compensation.

**117.** *See Hahn,* 611 P.2d at 67.

workers' use of "tar mats" or "Sorbent cloths." In addition, the experts viewed the mere presence of oil as harmful—in part because oil contamination of a wooden artifact might preclude or complicate accurate dating.

Dr. Johnson believed that nothing could be done to restore the sites to their pre-spill condition. She thus concluded that in order to mitigate the damage to the sites and remedy the loss of confidentiality, the archeological context of the affected sites should be fully explored and documented. Specifically, she proposed surveying and excavating the sites, collecting and curating artifacts, and publishing scholarly papers to document this work; she also proposed monitoring the sites on an interim basis to ensure site integrity until the project was completed. The estimated total cost of the plan was $29.5 million, with completion estimated to take approximately twenty-three years.

In response to the Corporations' expert archeological testimony, Exxon attempted to establish that the location of the sites was not confidential and, consequently, that there was no lost confidentiality. According to Exxon, a number of the sites were frequent stops for campers, fishermen, and tourists. In addition, Exxon maintains that many of the less traveled sites had been identified in archeological texts readily available to the public.

b. *The Corporations presented sufficient evidence of actual physical damage to archeologically significant sites on their lands to support the jury's verdict.*

 Exxon maintains that the only proof the Corporations adduced of actual physical damage to their archeological resources was evidence indicating that a line of graffiti had been added to a wall of the Old Chenega Village Schoolhouse. Exxon also maintains that the Corporations were unable to connect this line of graffiti to the spill or to the cleanup, as the schoolhouse was a "favorite camping site" even before the spill and was not a site that was kept confidential. Moreover, Exxon claims, there was no evidence

that this additional line of graffiti damaged the site, because the schoolhouse was already extensively defaced.

Exxon dismisses the remainder of the Corporations' evidence of physical damage as mere conjecture. Specifically, it maintains that the Corporations' experts speculated that shore-side deposits of artifacts "probably" reside in the vicinity of known archeological sites. The experts presumed, according to Exxon, that since the intertidal areas near these known upland sites were oiled, any related shore-side deposits also must have been oiled. According to Exxon, the experts further speculated that "oiling was tantamount to damage." Exxon claims that there were only three archeological resources—all owned by Chenega—that might have been oiled. Exxon insists that none was actually damaged by the oil. Exxon further insists that in addition to failing to demonstrate any damages to their sites, the Corporations failed to offer any evidence of a measure of damages appropriate for the alleged archeological harm.

But these tend to construe the record in Exxon's favor and minimize evidence of injuries that the Corporations claim to have suffered. For purposes of reviewing the denial of a directed verdict or judgment notwithstanding the verdict, we must view the evidence in the light most favorable to the Corporations.[118] The Corporations claimed that their sites were damaged by cleanup workers walking across them and by cleanup activities that may have moved, picked up, or washed away artifacts. Although the Corporations' evidence on these points could certainly have been clearer, there was at least some evidence of damage to specific sites and artifacts, from which reasonable jurors could have inferred that other similar damage occurred. Altogether, because our review of the record persuades us that the Corporations presented substantial evidence indicating that at least some sites and some artifacts were actually physically injured, we conclude that Exxon has failed to demonstrate that the evidence at trial was insuffi-

---

118. *See id.*

cient as a matter of law to support an award for physical damage.

### c. The Corporations' claim for loss-of-confidentiality damages is also legally sufficient.

Exxon next challenges as deficient the Corporations' loss-of-confidentiality theory of damages, which Exxon describes as the "real basis" for the Corporations' archeological damages claim. Exxon advances several arguments to support its position. It argues that it owed the Corporations no duty of confidentiality because disclosing the location of the sites was necessary to ensure that cleanup workers did not inadvertently damage them. But Exxon incorrectly defines the duty at issue: the duty to transport its oil safely. While the loss of confidentiality resulting from cleanup efforts may indeed have been inevitable once the spill occurred, Exxon was strictly liable for all foreseeable consequences of the spill—avoidable or inevitable.[119]

Next, Exxon argues that the location of the sites was not confidential. It points out that a number of the sites were listed in various publications. But the Corporations' experts testified that there is a qualitative difference between listing sites in obscure publications and physically exposing the sites to cleanup workers. This evidence of incremental loss created a factual dispute for the jury.

Exxon further contends that if the loss of confidentiality of the Corporations' sites results in any future harm, that harm would come in the form of theft or vandalism. Exxon insists that such criminal acts would be superseding causes that would preclude the spill from being considered a proximate cause of the future injury. Thus, Exxon reasons, the Corporations have necessarily failed to meet their burden of proving that the spill is a proximate cause of their future injuries.

But Exxon's theory of superseding causation misperceives the Corporations' alleged injury. The alleged injury is not the future vandalism itself, but the loss of confidentiality in the Corporations' archeological sites and the fear of vandalism that this loss engenders. The Corporations presented substantial expert testimony indicating that their fear of future harm is reasonable and that the most reasonable response to this fear is to take immediate action to salvage what they can of their sites. Under this theory, the Corporations' injury is complete without a single incident of vandalism occurring.

In any event, even assuming that Exxon is correct in characterizing the Corporations' damages as harm resulting from future acts of vandalism rather than the Corporations' reasonable fear of future vandalism, the oft-cited maxim that criminal acts are superseding causes is merely a rule of thumb. While a criminal act will ordinarily break the chain of causation, this general rule does not excuse the factfinder from examining the foreseeability of the intervening act. In *Williford v. L.J. Carr Investments, Inc.*, we discussed the theory of superseding causes:

> Superseding cause is a variant of the doctrine of proximate cause. This court has explained that the doctrine of superseding cause will relieve a negligent actor of liability only in exceptional cases. We have explained that an action of a third person which intervenes to injure the plaintiff will shield a negligent defendant only where[,] after the event and looking back from the harm to the actor's negligent conduct, it appears to the court *highly extraordinary* that it should have brought about the harm. Thus, an act will not constitute a superseding cause where, though unforeseeable by the original negligent actor, it does not appear in retrospect to have been highly extraordinary.[120]

Applying this test, we believe that reasonable jurors might be justified in concluding that Exxon's spill would be a proximate cause of the future vandalism that the Corporations fear.

Exxon finally contends that the Corporations offered nothing more than speculation

---

119. *See* AS 46.03.822.

120. 783 P.2d 235, 237 (Alaska 1989) (citations omitted) (internal quotations omitted).

and conjecture in support of the theory that their sites would suffer from future vandalism as a result of the oil spill. Exxon argues that speculation and conjecture are not a sufficient basis for an award of damages. Specifically, Exxon points out that during the five years between the spill and the trial, none of the Corporations' sites had been vandalized. Positing that "[t]he state of facts as they exist at the time of trial is the basis for any prospective damages claim," Exxon insists that there was insufficient evidence of future harm to present this question to the jury.

■■■■■■ But we conclude that the Corporations presented adequate evidence to support their loss-of-confidentiality claim. In *City of Fairbanks v. Nesbett*, we discussed the nature of proof required to establish future damages:

> The law does not permit a recovery of damages which is merely speculative or conjectural. . . . As a general rule, it refuses to allow a plaintiff damages relating to the future consequences of a tortious injury unless the proofs establish with reasonable probability the nature and extent of those consequences. . . . There must be some reasonable basis upon which a jury may estimate with a fair degree of certainty the probable loss which plaintiff will sustain in order to enable it to make an intelligent determination of the extent of this loss. . . . The burden is upon the plaintiff to furnish such proof. If he fails in this respect, the jury cannot supply the omission by speculation or conjecture. . . . The fact that there is some uncertainty as to plaintiff's damage or the fact that the damage is very difficult to measure will not preclude a jury from determining its value.[121]

The Corporations presented expert testimony that "there is a high likelihood that [oil-spill workers] will be coming back to different sites." The testimony indicated that the archeologists' concerns were based on the fact that oil-spill workers were taken out to the sites and were given information regarding how to identify sites. The archeologists' concerns were also based on incidents

of vandalism that occurred during the cleanup. While the Corporations' theory is not based on hard scientific evidence, neither is it based on rank speculation or conjecture. The expert testimony of Drs. Johnson and Lobdell provides a reasonable basis for the Corporations' loss-of-confidentiality claims. Whether the Corporations' fears of vandalism were reasonable is a factual issue that was properly left to the jury.

### III. CONCLUSION

Because we conclude that the superior court's OPA 90 instructions erroneously precluded the jury from awarding the Corporations damages for the selected but not yet conveyed federal lands, we REVERSE with respect to the Corporations' OPA 90 claims, but we AFFIRM in all other respects. We therefore REMAND this case for a retrial limited to the OPA 90 issues.

MATTHEWS, Chief Justice, COMPTON, EASTAUGH, and FABE, Justices, not participating.

---

**121.** 432 P.2d 607, 616 (Alaska 1967) (quoting *Henne v. Balick*, 146 A.2d 394, 396 (Del.1958)).